UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHARON CURTIS, and JANETTE CURTIS,

                    Plaintiffs,                         Case No. 1:23-cv-12859

v.                                              Honorable Thomas L. Ludington
                                              United States District Judge

DEUTSCHE BANK, et al.,

                    Defendants.

_____/

**OPINION AND ORDER (1) DENYING PLAINTIFFS' MOTION FOR EXPEDITED
CONFERENCE, (2) DIRECTING PLAINTIFFS TO RESPOND TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

      Sometimes one confronts a complicated or difficult case. This case—more accurately,

these four cases—are bizarre. These cases arise from a 2019 mortgage foreclosure initiated by a

power of sale and a County of Clare, Michigan, Sheriff's Sale of Plaintiff Sharon Curtis's

(hereinafter Sharon) residential property. Following the Sheriff's Sale, Sharon and her daughter,

Plaintiff Janette Curtis, have filed four lawsuits against the mortgagee, Defendant Deutsche Bank,

and the companies that serviced the loan, Defendants Ocwen Financial Corporation and PHH

Mortgage Corporation. Ultimately, Plaintiffs have challenged the unpaid loan balance secured by

the mortgage in the lawsuits.

      Plaintiffs' lawsuits have had a maze-like history, featuring Plaintiffs turning from one court

to another to air Sharon's alleged grievances. As a result, a brief, bullet-point roadmap of these

cases is, hopefully, helpful before a deeper dive into the specifics of the cases:

- On August 12, 2004, Sharon obtained a loan for $59,700 from Ameriquest Mortgage
  Company (Ameriquest) to renovate her property located at 166 E. Pine, Harrison,
  Michigan, and Ameriquest secured the loan with a mortgage on the property.

- In March 2013, Ameriquest assigned the lender and mortgagees' interests to Defendant Deutsche Bank, and Defendant Ocwen began servicing the loan.

- In 2018, Sharon defaulted on her loan repayment.

- In early 2019, Defendant Ocwen—which was in the process of merging with Defendant PHH—implemented a temporary repayment plan, requiring a monthly payment of $514.19 on the first of each month until the loan was current. Once again, Sharon defaulted on the repayment plan, so Defendant Ocwen canceled the plan.

- On December 4, 2019, Clare County Sheriff's Deputy conducted a foreclosure auction according to Defendant Deutsche Bank's power of sale in the mortgage. Defendant Deutsche Bank received a Sheriff's Deed for the property after placing the highest bid for $39,900.

- On February 14, 2020, Plaintiffs sued Defendants Deutsche Bank, Ocwen, PHH, and one of PHH's subsidiaries in state court in the 55th Circuit Court in Clare County, Michigan (*Clare County I*), asserting six claims, including one federal claim.

- On March 6, 2020, Defendants removed the case to the United States District Court for the Eastern District of Michigan, where the case was assigned to Judge Sean F. Cox (*Federal I*).

- On June 1, 2020, the five state claims were remanded to state court in *Clare County I*.

- On November 6, 2020, Judge Cox dismissed *Federal I*'s remaining claim because Plaintiffs failed to state a viable claim.

- On October 12, 2022, a CPA accounting firm was appointed as an independent expert to help resolve the remanded claims in *Clare County I*.

- On October 2, 2023, the appointed accounting firm in *Clare County I* completed a report concluding that the loan payoff balance was now $81,895.87.

- On November 9, 2023, Plaintiffs filed this case (*Federal II*) against Defendants, asserting two claims—one under the Real Estate Settlement Procedures Act (RESPA) and the other under the Truth in Lending Act (TILA)—alleging that loan account statements that were filed in *Clare County I* included fraudulent property inspection and insurance escrow charges.

- On January 26, 2024, Defendants filed a motion to dismiss based on federal abstention principles in *Federal II*. The motion was denied because "no Party ha[d] summarized the status of the [*Clare County I*] with clarity, nor ha[d] either Party provided a detailed explanation of which factual or legal issues—if any—[were] being adjudicated in state court at th[at] point, or specified how those issues overlap[ped] with Plaintiffs' RESPA and TILA claims in federal court." ECF No. 21 at PageID.1026.

- On February 21, 2024, Plaintiffs filed a second state court case in the 55th Circuit Court (*Clare County II*) against Defendants and their attorneys, asserting they tortiously interfered with Sharon's insurance policy on the property in dispute.

- On March 12, 2024, the Parties reached a settlement in *Clare County I* and placed the material terms on the record. The Parties stipulated to a loan payoff amount of $85,041.72 plus per diem interest and any additional fees that accrued before the settlement was finalized.[1]

- On September 30, 2024, the Parties resolved their disputes over the final settlement language in *Clare County I* and further explained their settlement on the court's record.

- On November 26, 2024, *Clare County II* is dismissed because Plaintiffs' complaint failed to state a viable claim and the claims were found to be frivolous.

- On January 3, 2025, the state court entered a final order effectuating the settlement in *Clare County I*. Defendants moved to amend the order. Sharon moved for reconsideration of the order, arguing that the stipulated payoff amount of $85,041.72 before interest and additional fees relied on the insurance escrow charges that Plaintiffs allege are fraudulent in *Federal II*.

- On January 16, 2025, Defendants move for summary judgment in *Federal II*, arguing that the doctrine of *res judicata* and statutes of limitation bar Plaintiffs' claims.

- On February 5, 2025, Plaintiffs filed a motion to compel Defendants to produce all insurance records related to Sharon's loan and escrow account in *Federal II*.

- On February 7, 2025, the state court granted Defendants' motion to amend and denied Sharon's motion for reconsideration in *Clare County I*, issuing a modified final order, providing that the case is dismissed with prejudice, Sharon's loan payoff amount is $85,041.72 plus interest and fees, Sharon is entitled to $22,000 in consideration for the settlement, and the 2019 Sheriff's Sale will be rescinded once Sharon repays her loan with funds from her "anticipated" lender.[2]

---

[1] While Sharon's promissory note and mortgage both provide for recovery of legal expenses incurred in enforcing the note and mortgage, they do not appear to have been included in Sharon's payoff amount. Equally significant is that the settlement did not seem to address a deficiency judgment for the difference between the unpaid loan balance and Defendant Deutsche Bank's Sheriff Sale bid for $39,900.

[2] The papers available to this Court do not explain the justification for Defendants' $22,000 payment to Sharon. And in executing their settlement, both Defendants and Plaintiffs appear to be relying on Sharon's representation that she has an available lender to refinance the property and assertions that "as Defendant[s] [are] fully aware, Plaintiffs have been ready, willing[,] and able to close for over three years." ECF No. 32 at PageID.2020.

- On March 31, 2025, Plaintiffs file a motion for a temporary restraining order (TRO) in *Federal II*. According to Plaintiffs, the loan payoff amount has now surpassed $93,000 after unpaid interest and fees are accounted for.

Against that summary, as noted, Plaintiffs filed their first complaint in *Clare County I* on February 14, 2020. Plaintiffs asserted several claims, including one federal claim under RESPA. Defendants removed that case to the United States District Court for the Eastern District of Michigan, creating *Federal I*. *Federal I* was then dismissed: on November 6, 2020, the court concluded that the RESPA claim failed to state a viable claim and remanded the state claims back to the Clare County Circuit Court.

The Parties then continued in *Clare County I*—the remanded state claims—for over three years. The state court dismissed most of the claims after Defendants filed motions for summary disposition, but found that Plaintiffs had sufficiently pleaded a demand for an accounting claim and a quiet title claim. During this period, a loan analyst for Defendant Ocwen filed an affidavit tracing the timeline of Sharon's default and the account transactions that led to the 2019 Sheriff's Sale. The analyst attached voluminous account statements and transaction histories for Sharon's loan. According to Defendant Ocwen's loan analyst, Sharon's unpaid loan balance was $75,047.80 as of November 10, 2022. The court ultimately appointed a CPA accounting firm as an independent expert to conduct an informal audit of Sharon's loan account at the Parties' expense to resolve the remaining claims.

In November 2023—one month after the appointed expert issued its report in *Clare County I*—Plaintiffs marched back to federal court and filed this case, *Federal II*. Plaintiffs assert a RESPA claim and a TILA claim based on perceived inaccuracies in loan account statements that Defendant Ocwen's loan analyst attached to the affidavit that he filed in *Clare County I*. Sharon's Counsel was in possession of some of these statements for over a year and a half before filing *Federal II*. And Sharon was in possession of the remaining statements for at least five years before

- 4 -

filing *Federal II*. Nonetheless, Plaintiffs maintain that these records contain fraudulent property inspection expenses and insurance escrow charges that inflated Sharon's loan payoff.

After the Parties filed preliminary motions in *Federal II*, they returned to state court. In February 2024, Plaintiffs filed a second case in state court, *Clare County II*. In *Clare County II*, Plaintiffs advanced two tortious interference claims against Defendants and their attorneys, alleging that they tortiously interfered with Sharon's insurance coverage for the mortgaged property. The state court ultimately dismissed *Clare County II*, concluding that Plaintiffs' claims were frivolous.

Soon after Plaintiffs filed *Clare County II*, the Parties settled *Clare County I* at a hearing in March 2024—stipulating to a payoff amount for Sharon's loan. The state court directed the Parties to submit a proposed order to effectuate the settlement. Yet months passed without the Parties submitting a proposed order, so the state court conducted a follow-up hearing in September 2024. At that hearing, the Parties contested many ancillary terms of the settlement but assured that the stipulated payoff amount remained agreeable. After Defendants compromised on the settlement's language, the state court redirected the Parties to submit a proposed order effectuating the finalized terms.

On January 3, 2025, the state court entered an order effectuating the settlement in *Clare County I*. The order rescinded the 2019 Sheriff's Sale, directed Sharon to repay her loan at the stipulated $85,041.72 plus interest and fees, directed Defendants to pay an agreed $22,000 in consideration for the settlement, and dismissed the case with prejudice. Defendants moved to amend the order to require Sharon to refinance and repay the loan before the court would rescind the 2019 Sheriff's Sale. In short, Defendants sought to avoid Sharon accepting the settlement consideration of $22,000 without repaying her loan. Sharon, for her part, moved for

reconsideration of the order, arguing that when the Parties calculated the stipulated loan payoff amount, they mistakenly relied on the charges that she alleges are fraudulent in this case.

On February 7, 2025, the state court denied Sharon's motion for reconsideration and granted Defendants' motion to amend the judgment. In so doing, it modified its January 3, 2025 order to condition the recission of the 2019 Sheriff's Sale on Sharon's payment of the loan within 30 days of receiving the payoff funds from her anticipated lender. Once Sharon completed her responsibilities, Defendants would notify the court, which, in turn, would rescind the Sheriff's Sale.

The Parties have now pivoted back to *Federal II*. Following the *Clare County I* dismissal, Defendants moved for summary judgment in *Federal II*, contending that the doctrine of *res judicata* and statutes of limitations bar Plaintiffs' RESPA and TILA claims. In response, Plaintiffs filed a motion seeking (1) a stay of their deadline to respond to Defendants' Motion for Summary Judgment and (2) an order compelling Defendants to produce all insurance records related to the escrow charges in Sharon's loan repayment statements. This Court stayed Plaintiffs' deadline to respond to Defendants' Motion for Summary Judgment until it addressed Plaintiffs' Motion. Soon after, Plaintiffs filed a motion for a TRO precluding future transfers of the property in dispute. As explained below, Plaintiffs' Motion to compel Defendants to produce "insurance records" will be denied. Likewise, Plaintiffs' Motion for a TRO will be denied. And Plaintiffs will be directed to respond to Defendants' Motion for Summary Judgment.

## I.

### A. 2004–2019: Sharon's Mortgage, Default, and Sheriff's Sale

In August 2004, Plaintiff Sharon Curtis and her former spouse, Neal Curtis,[3] obtained a loan for $59,700.00 from Ameriquest Mortgage Company to remodel their home on Pine Street in Harrison, Michigan. *See* ECF Nos. 1-4 at PageID.47; 31-2 at PageID.1108. Under the loan promissory note, Sharon and Neal agreed to make monthly payments of $397.19 until the loan was paid or until the loan's promissory note matured on September 1, 2034, at which point she would pay the remaining balance. ECF No. 1-4 at PageID.47. The promissory note and the mortgage securing repayment of the note also contained relatively standard default language. *Id.* at PageID.47–48; *see also* ECF No. 31-10.

Ameriquest's mortgage, for its part, contained a power of sale and payment acceleration provisions if Sharon defaulted on the loan. ECF No. 31-10 at PageID.1466, 1477. In March 2013, Ameriquest assigned the lender's interest, including this mortgage, to Defendant Deutsche Bank. ECF No. 31-11. Following the assignment, Defendant Ocwen Financial Corporation became the loan servicer until 2019. ECF No. 40-4 at PageID.2354–55. Defendant Ocwen later merged with Defendant PHH Mortgage Corporation in 2019, at which point PHH began servicing the loan. *Id.* at PageID.2355.

Eventually, Sharon defaulted on the loan in 2018. *See* ECF No. 1-4 at PageID.42. After Sharon attempted to make partial payments from August 2018 to February 2019 that did not cure the default, Defendant Ocwen returned the payments and implemented a temporary repayment

---

[3] Neal Curtis, who has since passed away, no longer holds an interest in the relevant property. *See* ECF No. 40-4 at PageID.2354; *see also* ECF No. 31-7 at PageID.1360. Indeed, he and Sharon divorced in 2012, so in May 2013, Mr. Curtis executed a quit-claim deed transferring his property interest to Sharon. *Id.* Importantly, unless Ameriquest released Mr. Curtis from repayment of the loan, he—and eventually his estate—remained responsible for the loan's repayment.

plan. *Id.* at PageID.42–43; *see also* ECF No. 31-2 at PageID.1172–77, 1179–81, 1192–96. During the servicing transition between Defendants Ocwen and PHH, loan servicing representatives continued to send Sharon delinquency notices, some of which seemingly contained conflicting information about her repayment responsibilities. *See* ECF No. 31-2 at PageID.1181–82, 1198. But the repayment plan warned Sharon about these continued notices and explained Sharon's repayment obligation. *See id.* at PageID.1192–96. To that end, the plan required Sharon to make an initial down payment of $820.00 in March 2019. *See id.* After the down payment, the plan required Sharon to remit monthly payments of $514.19 on the first of each month, beginning May 1, 2019, through March 1, 2020, to bring the loan current. *See id.* The plan also provided that there were no unwritten terms, "no grace period[s]" for the payment due dates, and if the plan's terms were not satisfied, it would "be automatically canceled." *See id.* at PageID.1194, 1196. Yet despite these provisions, Sharon did not timely fulfill her repayment obligations, so the plan was canceled. *See* ECF No. 1-4 at PageID.43; *see also* ECF No. 31-2 at PageID.1182, 1196.

In October 2019, after sending Sharon additional delinquency notices, Defendant Deutsche Bank elected to exercise its power of sale and initiated foreclosure by advertisement procedures under MICH. COMP. LAWS § 600.3201 *et seq. See* ECF No. 31-2 at PageID.1213, 1222. Once Deutsche Bank published a satisfactory notice of foreclosure in a qualified newspaper for four successive weeks as required by MICH. COMP. LAWS §§ 600.3208, 600.3212, the Clare County Sheriff's Deputy conducted a public auction of Sharon's property on December 4, 2019. *See id.* at PageID.1220–24. As authorized by MICH. COMP. LAWS § 600.3228, Deutsche Bank participated in the auction, placed a credit bid for the property, and received a Sheriff's Deed. *See id.* at PageID.1220–25. And this Sheriff's Sale triggered a six-month redemption period under MICH. COMP. LAWS § 600.3240(8), during which Sharon could redeem her property for $39,900 plus

interest—the amount specified in Deutsche Bank's statutorily required purchaser's affidavit.[4] *See id.* at PageID.1225.

### B. 2020: *Clare County I*, Removal, Remand, and Federal Dismissal

Rather than exercising her right of redemption, Sharon and her daughter, Plaintiff Janette Curtis,[5] launched a campaign of litigation in multiple courts. On February 14, 2020, Plaintiffs sued Defendants Deutsche Bank, Ocwen, PHH, and one of PHH's subsidiaries in the 55th Circuit Court in Clare County, Michigan (*Clare County I*). *See* ECF No. 31-2. Sharon and Janette brought six claims: one federal claim under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et seq.*, and five state-law claims. *See id.* at PageID.1112–18. The focus of these claims was the allegation that loan servicing errors rendered the 2019 Sheriff's Sale voidable. *See id.*

On March 6, 2020, Defendants removed *Clare County I* to this Court (*Federal I*), contending that the RESPA claim provided federal question jurisdiction. ECF No. 31-3 at PageID.1263. The case was then assigned to Judge Sean F. Cox. *Id.* On June 1, 2020, Judge Cox declined to exercise supplemental jurisdiction over the five state claims, remanding them to the Clare County Circuit Court. *See Curtis, et al., v. Deutsche Bank National Trust Co., et al.*, Case No. 1:20-cv-10609 (E.D. Mich. June 1, 2020).

After remanding the state claims, Judge Cox dismissed *Federal I* on November 6, 2020. *See id.* at PageID.1273. His reasoning was two-fold. *See id.* at PageID.1267–72. First, Janette did not have standing to bring a RESPA claim because she was not the borrower under the operative loan, and "'only a borrower on a loan'" can bring a RESPA claim. *Id.* at PageID.1267 (quoting

---

[4] Despite this Sheriff's Sale, Sharon has continued to live on the property in dispute. *See* ECF No. 41-1 at PageID.2366 (noting Sharon lives at the property and Defendants are currently "threatening to evict" her).

[5] Janette is also Sharon's guardian and conservator because Sharon is legally incapacitated. *See* ECF Nos. 1 at PageID.2–3; 41-1 at PageID.2365.

*Keen v. Helson*, 930 F.3d 799, 804 (6th Cir. 2019)). Second, the complaint did not cite any specific RESPA provision that Defendants violated and failed to sufficiently allege facts to support any RESPA claim in the first instance. *Id.* at PageID.1267–72.

### C. 2021–2023: Remanded State Claims Continue in *Clare County I*

Following *Federal I*'s dismissal, Janette and Sharon "litigated" their five remanded state claims in state court in *Clare County I. See* ECF No. 31-4. In August 2021, they amended their complaint, adding four additional claims that asserted various tort theories under Michigan law. *See id.* at PageID.1292–94. After Defendants filed dispositive motions, the circuit court dismissed Janette because, as Judge Cox concluded in *Federal I*, she was not an obligor for the loan or owner of the relevant property and thus lacked standing to sue Defendants. *See* ECF No. 31-13 at PageID.1496–97. The court also dismissed seven of Sharon's nine claims, leaving just two claims to be resolved in *Clare County I*: (1) a demand for an accounting claim; and (2) a quiet title claim. *See id.* at PageID.1502; *see also* ECF No. 12-4 at PageID.934–35.

In response to a report that concluded Sharon's loan servicing statements contained errors—prepared by a certified public accountant whom Sharon retained—a loan analyst for Defendant Ocwen filed an affidavit (the Affidavit) on behalf of Defendants on November 10, 2022. *See* ECF No. 1-4. The Affidavit explained that Sharon defaulted on her loan and why her repayment plan was terminated before the Sheriff's Sale. *See* ECF No. 1-4 at PageID.38–45, 88–90. In support of this explanation, the loan analyst attached Sharon's account statements that reflected her material account transaction history from February 2013 to July 1, 2022. *See id.* at PageID.76–86, 95–106; *see also* ECF Nos. 1-5 at PageID.107–72; 1-6 at PageID.173–231; 1-7 at PageID.232–316; 1-8 at PageID.317–93. Importantly, Sharon received copies of many of these account statements on January 16, 2018. *See* 31-16 at PageID.1928–38. And Sharon's Counsel

received copies of the rest on July 6, 2022. *See* ECF No. 31-18. In addition to these account statements, the loan analyst attached a loan reinstatement and payoff quote, totaling—at that time—$75,047.80 after unpaid principal, interest, escrow charges, and late fees. 31-16 at PageID.1920–26. The quote attached to the Affidavit warned that without repayments of the loan, interest would continue to accrue at a rate of $2.29 per day. *Id.* at PageID.1921.

In any event, the state court ultimately "found it necessary" to appoint a CPA accounting firm, Boge, Wybenga, and Bradley, as an independent expert "to review the parties' evidence" on the "remaining amount owed on the mortgage" at the Parties' expense. ECF No. 31-14 at PageID.1506–07. By the time the firm completed its report on October 2, 2023, as warned, the loan payoff amount had increased. *See* ECF No. 31-5 at PageID.1299. Indeed, the independent expert concluded that Sharon's loan payoff was $81,895.87, including unpaid fees and escrow charges. *Compare id. with* ECF No. 31-16 at PageID.1921.

### D. 2023–2024: *Federal II*

About a month after the independent expert issued its report—and while *Clare County I* proceeded—Plaintiffs Sharon and Janette marched back to federal court, filing this case, *Federal II*, on November 9, 2023. ECF No. 1. They bring two claims against Defendants Deutsche Bank, Ocwen, and PHH. *See id.* at PageID.5–8. First, Plaintiffs allege that Defendants violated RESPA's implementing regulation, 12 C.F.R. § 1024.17(c). *See id.* at PageID.5–6. Second, Plaintiffs allege Defendants violated the Truth in Lending Act (TILA)'s implementing regulation, 12 C.F.R. § 1026.36(c)(3).[6] *See id.* at PageID.6–8. Factually, Plaintiffs base these claims on the account

---

[6] Plaintiffs' Complaint indicates that the TILA claim is based on a violation of 36 U.S.C. § 1026.36(c)(3), a statute that does not exist. *See* ECF Nos. 1 at PageID.7; 21 at PageID.1025. But Defendants acknowledge that this is a typographical error and that the applicable provision is 12 C.F.R. § 1026.36(c)(3). *See* ECF No. 31 at PageID.1092, n.24.

statements attached to the Affidavit that Ocwen's loan analyst filed in *Clare County I. See id.* at PageID.4–7 (citing ECF No. 1-4). To that end, they allege that two categories of "charges" in the account statements inaccurately inflate Sharon's loan reinstatement payoff balance. *See id.* at PageID.4–8.

First, Plaintiffs allege that Defendants fraudulently charged "multiple" $10.50 "property inspection" fees "on the same day" in September 2013. *See id.* at PageID.5 (emphasis omitted); *see also* ECF No. 1-4 at PageID.76. Notably, the account statements that Plaintiffs reference in their Complaint reflect that the inspection fees were charged months before September 2013. ECF No. 1-4 at PageID.76; *see also* 31-16 at PageID.1929–30. And the account statements' column headings show that the September 2013 inspection transactions were *payments* made by Sharon—*not* fraudulent charges imposed by Defendants:

| Date Payment Due | Date Payment Received | Date Assessed/ Transaction Date | Description | Amount Applied/ Assessed | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/ Other (See Description) | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/2012 | | | Beginning Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 139.02 | -863.12 | 0.00 | 53,592.65 | 0.00 | 51.05 |
| | | 02/11/2013 | Loan Disbursement | -54,404.72 | -53,592.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51.05 | 53,592.65 | 0.00 | 51.05 |
| | 02/11/2013 | | Escrow Account Adjustment | -830.93 | 0.00 | 0.00 | -830.93 | 0.00 | 0.00 | 0.00 | 0.00 | 53,592.65 | -830.93 | 51.05 |
| | | 03/25/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | -830.93 | 0.00 |
| | 04/02/2013 | | Suspense Transfer | -51.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -51.05 | 53,592.65 | -830.93 | 0.00 |
| | 04/02/2013 | | Suspense Transfer | 51.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51.05 | 53,592.65 | -830.93 | 51.05 |
| | | 05/02/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 05/17/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 06/24/2013 | | Forbearance Payment | 333.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 333.00 | 53,592.65 | -830.93 | 384.05 |
| | | 07/01/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 07/02/2013 | Transaction History Fee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 07/11/2013 | | Forbearance Payment | 350.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 350.00 | 53,592.65 | -830.93 | 734.05 |
| | 07/11/2013 | | Altplan Suspense Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53,592.65 | -830.93 | 734.05 |
| 08/01/2012 | 07/11/2013 | | Payment | 0.00 | 84.57 | 312.62 | 169.62 | 0.00 | 0.00 | 0.00 | -566.81 | 53,508.08 | -661.31 | 167.24 |
| | | 07/11/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 07/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 07/18/2013 | Tax Disbursement-HARRISON CITY | -718.15 | 0.00 | 0.00 | -718.15 | 0.00 | 0.00 | 0.00 | 0.00 | 53,508.08 | -1,379.46 | 167.24 |
| | | 08/12/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 09/04/2013 | | Prior Servicer Fees | 863.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 863.12 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Forbearance Payment | 277.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 277.42 | 53,508.08 | -1,379.46 | 444.66 |
| | 09/04/2013 | | Suspense Transfer | -167.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -167.24 | 53,508.08 | -1,379.46 | 277.42 |
| | 09/04/2013 | | Escrow Account Adjustment | 167.24 | 0.00 | 0.00 | 167.24 | 0.00 | 0.00 | 0.00 | 0.00 | 53,508.08 | -1,212.22 | 277.42 |

ECF No. 1-4 at PageID.76 (black marker in original) (yellow highlights added) (reflecting Plaintiff's six *positive* payments of $10.50 "applied to" the balance of her loan on September 4, 2013, corresponding to the six *negative* $10.50 charges "assessed" as early as March 2013); *see also* 31-16 at PageID.1929–30.

Second, Plaintiffs assert that Defendants applied a series of fraudulent charges to Sharon's escrow account. *See* ECF No. 1 at PageID.4–7. According to Plaintiffs, from January 7, 2020, to July 1, 2022, Defendants charged Sharon's escrow account without using the amounts levied for insurance or property taxes. *See id.*; *see also* ECF No. 1-4 at PageID.84–86. The challenged charges total approximately $11,900. *See* ECF No. 1-4 at PageID.84–86. Ultimately, Plaintiffs allege that these charges improperly inflated Sharon's escrow account deficit, increasing her loan reinstatement payoff amount. *See* ECF No. 1 at PageID.4–7.

About a month after filing their Complaint, Plaintiffs filed a motion for a temporary restraining order (TRO), seeking an order staying *Clare County I*. ECF No. 3. The next day, this Court denied Plaintiffs' request because federal courts cannot enjoin ongoing state-court cases except in three scenarios, none of which applied. ECF No. 4 (citing 28 U.S.C. § 2283); *see also Smith v. Bayer Corp.*, 564 U.S. 229, 306 (2011) (noting exceptions to the Anti-Injunction Act are "narrow" and should not "be enlarged by loose statutory construction.").

On January 26, 2024, Defendants filed a motion to dismiss under Civil Rule 12(b)(1), arguing that the *Colorado River* abstention doctrine[7] applied to this case because *Clare County I*

---

[7] The narrowly applicable *Colorado River* abstention doctrine directs federal courts to abstain from resolving a case when parallel proceedings are ongoing in another adequate jurisdictional forum, i.e., state court. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). It may also apply when a combination of factors, such as the potential of piecemeal litigation, would "counsel against concurrent federal proceedings." *Id.* at 819. This doctrine is distinct from the doctrine of *res judicata*, contrary to Sharon's Counsel's representation in a state-court hearing. *See* ECF No. 31-6 at PageID.1318–19.

was based on the same underlying facts. ECF No. 12 at PageID.872, 874. Rather than address whether *Colorado River* abstention applied, Plaintiffs responded by stating that they had "[s]ufficiently pled the complaint" because they "specifically identified [] damages arising from the RESPA and TILA violations." ECF No. 16 at PageID.970. Plaintiffs also opposed Defendants' motion because, according to them, Defendants failed to comply with Local Rule 7.1's meet-and-confer requirements. *See id.* at PageID.9698–69. They then filed a motion requesting that this Court not resolve Defendants' motion to dismiss for seven days so they could collect and file additional evidence. ECF No. 19.

In the end, this Court denied Defendants' motion to dismiss and denied as moot Plaintiffs' motion for a delay. *See* ECF No. 21. At that juncture, the Parties had not provided enough information about *Clare County I* to assess the *Colorado River* abstention doctrine's applicability to *Federal II*. *See id.* at PageID.1022. *Federal II* sat relatively idle after that decision.

### E. 2024–2025: Second Wave of State-Court Litigation

After Plaintiffs filed *Federal II* and while it sat idle, the Parties pushed forward in state court. Plaintiffs filed a second case in state court, which was eventually dismissed for failing to state a viable claim. The Parties also returned to *Clare County I* and settled the case, despite some consternation. The state-court litigation is summarized in detail below.

#### 1. Plaintiffs File *Clare County II*

On February 21, 2024, Plaintiffs filed a second state case against Defendants in the Clare County Circuit Court, *Clare County II*. ECF No. 31-8 at PageID.1364. In that case, Plaintiffs asserted that Defendants and their attorneys tortiously interfered with a hazard insurance contract between Plaintiffs and Farm Bureau Insurance Company. *See id.* at PageID.1383–84, 1388–90. Specifically, Plaintiffs alleged that Defendants—as loss payees on Plaintiffs' insurance policy—refused to execute checks that Sharon needed to complete repairs of the property subject to the

2019 Sheriff's Sale. *Id.* at PageID.1386–90. Without elaborating, Plaintiffs also claimed that this alleged refusal placed Plaintiffs "in danger of losing their insurance coverage" on the property. *Id.* at PageID.1387.

### 2. March 2024 Settlement Hearing in *Clare County I*

After Plaintiffs launched *Clare County II*, the Parties continued to advance *Clare County I*. At a hearing on March 12, 2024, Sharon and Defendants reached a settlement and recited the material terms of the settlement on the record. *See* ECF No. 31-15. The agreed upon settlement included the following material terms: (1) Sharon's loan would bear a stipulated payoff "amount of $85,041.72 with per diem interest in the amount of $2.29 per day" and if Defendant advanced "any additional insurance" the "monthly amount would be $397.95"; (2) Sharon would pay "off the mortgage with a new loan"; (3) Defendants would pay Sharon $22,000 as consideration to encourage the settlement; (4) Defendants would not further encumber the property; (5) Defendants would "remove the credit line pertaining to this foreclosure"; (6) the order effectuating the settlement would rescind the 2019 Sheriff's Sale. *See id.* at PageID.1520–21.

Before completing the hearing, Sharon's Counsel—who also represents Plaintiffs in this case—requested "that [she] be allowed to confirm on the record that" Sharon agreed. *Id.* at PageID.1522. The court agreed, and Sharon engaged in the following dialogue with her attorney:

> **Sharon's Counsel**: Thank you. [Sharon], you heard all of the terms placed on the record today, are you in agreement with this settlement?
>
> **Sharon**: Yes.
>
> **Sharon's Counsel**: And do you understand that if we went to trial on this matter, we could prevail or [lose], and you could get a better settlement, or a worse settlement in this case?
>
> **Sharon**: Yes.
>
> **Sharon's Counsel**: And did I satisfactorily answer all of your questions?

- 15 -

> **Sharon**: Yes.

*Id.* After this exchange, the state court directed the Parties to submit a proposed order effectuating their settlement. *See id.* at PageID.1521–23.

### 3. September 2024 Settlement Hearing in *Clare County I*

After several months passed without the Parties submitting a draft order in *Clare County I* that finalized the settlement, the state court directed the Parties to attend a second settlement hearing on September 30, 2024. *See* ECF No. 31-6 at PageID.1303, 1305–06, 1313–14, 1351. At the start of the hearing, Sharon's Counsel reiterated that the Parties agreed on the loan payoff amount of $85,041.72 and did not wish to set aside the settlement. *See id.* at PageID.1313, 1316. But she indicated that Sharon disputed some of the terms in the memorialized settlement agreement that Defendants sent her. *See id.* at PageID.1316–54.

One term that Sharon disputed was a confidentiality provision. *See id.* at PageID.1316–21. Defendants included the provision to ensure that Sharon or her Counsel would not publish the settlement online to "encourage . . . frivolous lawsuits." *Id.* at PageID.1318. But Sharon's Counsel worried that a confidentiality term could limit Sharon's ability to testify in this case and before the Michigan Attorney General if necessary. *Id.* at PageID.1318–21. The court agreed that the confidentiality term should specify that Sharon is not barred from disclosing settlement terms "in . . . pending litigation" or "any Attorney General cases." *See id.* at PageID.1330–32.

Sharon also disputed the contemplated release-of-claims provision. *Id.* at PageID.1321, 1326–27. This provision would have released all claims related to or arising out of *Clare County I*, including Plaintiffs' TILA and RESPA claims in *Federal II* and all unknown or future claims. *See id.* at PageID.1326–27, 1332–34. Even though Sharon's Counsel had already stipulated to a loan payoff amount—in essence, a stipulated loan accounting—she insisted, confusingly, that she

could not agree to release Sharon's RESPA and TILA claims, which, once again, are based on Defendants' purported accounting errors. *See id.*

Due to Sharon's Counsel's resistance to the release-of-claims provision, the state court eventually questioned whether the Parties reached a "meeting of the minds" in the first instance:

> **The State Court:** So, Ms. Moran[,] I guess what I am hearing from you is that there isn't, there was no meeting of the minds. So, that there is just no meeting of the minds, I mean we can't work out the side terms of this agreement[,] so therefore what you['re] telling is that we need to just schedule this for a trial and be done.

*Id.* at PageID.1334. Sharon's Counsel and the court then engaged in a colloquy, during which Sharon's Counsel explained that the Parties reached an agreement but that it must be limited to the terms placed on the record at the March 2024 hearing:

> **The State Court**: [W]e are fighting over issues that I think are a pretty big deal. Whether this resolves the other stuff or not, that appears to be what the idea of the defense was, is that those issues were resolved. . . . I am trying to resolve this case, . . . . What I am hearing is language that is telling me that I can, based on your response to her argument, say fine[,] we will go to trial and be done with it, and then I don't have to worry about this. You may speak, --
>
> ***
>
> **Sharon's Counsel**: Thank you. So, it appears[,] Your Honor[,] that you are attempting to have a chilling [e]ffect by stating incorrectly, I will politely say it, that there was no meeting of the minds. There was a meeting of the minds, it was clearly placed on the record, we have a transcript. [Defense Counsel] had a full opportunity to add to, subtract from, or correct said transcript, she did not. Now[,] after the fact[,] . . . [they're] attempting to add in all this extra language that was never discussed, never negotiated, and never put on the record. Stating that my client can't [pursue] her claims in Federal Court . . . . But it does matter when a party [comes] into this Court and tries to add in things to a settlement that were never agreed to and never placed on the record.

*Id.* at PageID.1334–36.

Because of this dispute, Defendants stated they would be willing to strike much of the release-of-claims provision. *See id.* at PageID.1332–33, 1336–39. In their view, the settlement and dismissal of *Clare County I* would bar any related pending claims under the doctrine of *res*

- 17 -

*judicata*, including *Federal II*'s TILA and RESPA claims. *See id.* As a result, Defendants conceded so long as the Parties included two terms in the release-of-claims provision: (1) that by striking the language releasing the TILA and RESPA claims, Defendants were not conceding that those claims were still viable; and (2) that all unknown claims are released, so Sharon could not "come back in a year or two and come up with a new claim that relates to this settlement that should have been settled as part of this transaction." *Id.* at PageID.1340–41, 1344–45.

Defendants' suggestion led to a resolution of the issue. *See id.* at PageID.1343–46. The court and the Parties agreed to strike the clause that released the claims in *Federal II*, noting that Defendants did not concede that those claims were viable. *See id.* at PageID.1339–40. And they ultimately concluded that—despite Defendants' initial request for the term—striking the release of unknown claims clause was the simplest solution to ensure the Parties settled. *See id.* at PageID.1344–46.

That left one final disputed term: the amount Sharon owed in interest that had accrued since the March 2024 settlement hearing. *See id.* at PageID.1348–54. Again, Sharon's Counsel agreed that the loan payoff amount was $85,041.72. *Id.* at PageID.1348–49. Yet despite Sharon's agreement in March to pay per diem interest that continued to accrue—and Sharon's Counsel's insistence that the March settlement terms be enforced as stated—Sharon's Counsel argued that Sharon should not have to pay the accrued interest. *See id.* at PaegID.1348–54. Sharon's Counsel blamed Defense Counsel for the seven-month delay in finalizing a settlement, which, she argued, caused the ongoing interest accrual. *See id.* at PageID.1349. To that end, Sharon's Counsel asserted that Defense Counsel triggered the delay because she did not send Sharon's Counsel a draft settlement until eight days after the March 2024 settlement hearing, when the Parties agreed Defense Counsel would do so seven days after the hearing. *See id.* at PageID.1349–50, 1313.

Sharon's Counsel also stated that she sent proposed edits to the draft, which Defense Counsel allegedly never shared with Defendants. *See id.* at PageID.1349.

But the state court rejected Sharon's Counsel's contentions. *See id.* at PageID.1349–55. It observed that even if Defense Counsel were dilatory, Sharon's Counsel never "file[d] [a] motion or advance[d]" the settlement "in any way to prevent . . . interest from accruing." *Id.* at PageID.1349. So the court ruled that Sharon was responsible for the per diem interest that had accrued since the March 2024 hearing and directed Defense Counsel to submit a proposed order that finalized the settlement.[8] *Id.* at PageID.1354.

### 4. *Clare County II* Dismissed

Following the September 2024 hearing in *Clare County I*, on November 26, 2024, the state court dismissed *Clare County II*. *See* ECF No. 31-9. The court concluded—like it did in *Clare County I* and Judge Cox did in *Federal I*—that Janette was not a proper plaintiff because any injury from Defendants' alleged tortious interference injured Sharon, not Janette. *See id.* at PageID.1455–56. The court also concluded that Sharon failed to state a viable claim for tortious interference. *Id.* at PageID.1456–57. And the court explained that even if she did state a viable claim, it was barred by the doctrine of *res judicata* and Michigan Court Rules. *Id.* at PageID.1460–61. Indeed, because *Clare County II* involved the same parties and claims related to those in *Clare County I*, Michigan law required Sharon to supplement her complaint in *Clare County I* rather than bring a separate action. *See id.*

After concluding that Plaintiffs failed to state a viable claim, the court awarded Defendants costs and attorneys' fees, finding that Plaintiffs' claims were frivolous. *Id.* at PageID.1457–59.

---

[8] According to an affidavit that Janette recently filed, the total payoff amount now surpasses $93,000 when the accrued interest and other fees are applied. *See* ECF No. 41-1 at PageID.2366.

First, the court found that Janette's claims were frivolous because the court dismissed her claims in *Clare County I* for the same reasons:

> The parties to this litigation are nearly identical to [the initial state case]. The facts of this case rely on the events of [*Clare County I*] as their foundation. The claims by Janette Curtis, as an individual, are likely barred by res judicata. The issue of Janette Curtis' individual claims was resolved by summary disposition. The parties in each case are substantially identical. Janette Curtis made individual claims regarding the foreclosure of a house she does not own, and now she was part of claims for tortious interference regarding the maintenance of a house she does not own. Then, and now, Janette Curtis never presented any legal argument that lends to a proper claim for her to make. In [*Clare County I*], she was dismissed for these reasons. It is an error for Plaintiffs and their counsel to come to court with nearly identical facts and no supportive basis in law in the complaint[,] and to present Janette Curtis as having claims in this case against these Defendants.

*Id.* at PageID.1457–58. Second, Sharon's tortious interference claims had "no basis in fact or law," further warranting sanctions for frivolity. *See id.* at PageID.1458–59.

### 5. Orders Effectuating the *Clare County I* Settlement

Once the state court dismissed *Clare County II*, it entered a final order and judgment effectuating the settlement in *Clare County I* on January 3, 2025. ECF No. 31-7. This order, among other things, accomplished the following: it (1) rescinded the 2019 Sheriff's Sale; (2) reinstated Defendants' mortgage on Sharon's property; (3) directed Sharon to repay her loan at the stipulated payoff amount of $85,041.72 within forty-five days; (4) directed Defendants to pay Sharon the agreed upon $22,000 in consideration for the settlement; and (5) dismissed the case with prejudice and without costs to the Parties.[9] *Id.* at PageID.1361–62. Post-judgment motions followed. *See* ECF Nos. 40-2; 40-3.

Defendants, for their part, moved to amend the January 3, 2025 order to require Sharon to repay the loan *before* the court rescinded the Sheriff's Sale. ECF No. 40-2. Essentially, Defendants

---

[9] Notably, the promissory note and mortgage terms would have allowed Deutsche Bank to pursue attorneys' fees and costs for the litigation. ECF No. 1-4 at PageID.48, 58. But they presumably waived this right.

sought to avoid Sharon taking the settlement consideration and refusing to repay her loan. *Id.* at PageID.2321 ("In the event that [Sharon] fails to pay off the loan after receipt of payment from Defendants, Defendants will be out of the consideration paid to resolve this dispute and then have to restart foreclosure proceedings—which[] will open up Defendants to further challenges to foreclosure by [Sharon].").

Sharon, for her part, moved for reconsideration of the order. ECF No. 40-3. Sharon argued that when the Parties calculated the loan payoff amount included in the order, they mistakenly relied on insurance escrow charges that she alleges are fraudulent in *Federal II*. *See id.* at PageID.2340–43. In Sharon's view, the loan payoff needed to be recalculated once again. *See id.* Sharon also rehashed her position that Defendants should pay any accrued interest because they delayed finalizing the settlement. *See id.*

On February 7, 2025, the state court granted Defendants' motion to amend, denied Sharon's motion for reconsideration, vacated the January 3, 2025 order, and issued a new final order. *See* ECF No. 36-2; *see also Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.). As Defendants requested, the February 7, 2025 order permits recission of the 2019 Sheriff's Sale only if Sharon pays off her loan within 30 days of receiving payoff funds from the lender that Sharon's counsel had located. *See* ECF No. 36-2 at PageID.2052. But the February 7, 2025 order did not modify all other terms, including Sharon's base loan payoff amount. *See id.* at PageID.2051. Notably, Sharon did not file a timely appeal. *See Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.); *see also* MCR 7.104 (imposing 21-day deadline to appeal).

**F. Early 2025–Present: Return to *Federal II***

The Parties have returned *Federal II*. As Defendants signaled during the September 2024 settlement hearing, after the state court dismissed *Clare County I* with prejudice, Defendants moved for summary judgment in this case, *Federal II*. *See* ECF No. 31. Defendants argue that the doctrine of *res judicata*—considering the dispositions in *Federal I*, *Clare County I*, and *Clare County II*—and relevant statutes of limitations bar Plaintiffs' TILA and RESPA claims. *See generally id.*

After Defendants filed their Motion, Plaintiffs filed two motions. First, Plaintiffs filed a motion seeking an order that stays their response to Defendants' Motion for Summary Judgment and compels Defendants to produce all insurance records regarding Sharon's loan accounts.[10] ECF No. 32. This Court stayed Plaintiffs' response pending resolution of the discovery issues raised in their Motion. Second, citing concerns that Defendants might attempt to evict Sharon, Plaintiffs filed a motion for a TRO enjoining Defendants from further transferring the property in dispute. ECF No. 39.

**II.**

This Court begins with Plaintiffs' Motion seeking an order that stays their response to Defendants' Motion for Summary Judgment—which this Court did, *see* ECF No. 32—and compels discovery. Setting aside Plaintiffs' request to adjourn their response deadline, in essence, Plaintiffs' Motion is a motion to compel discovery under Civil Rule 37. *See* ECF No. 32. Indeed, the Motion seeks to compel Defendants to "supply all insurance policy information" under which Defendants charged Sharon's escrow account to generate the payoff total for her loan. *See* ECF

---

[10] The Motion also sought an expedited conference, but the Parties were already required to attend a settlement conference eight days after Plaintiffs filed their Motion. *Compare* ECF No. 32 *with* ECF Nos. 30; 35.

No. 32 at PageID.2022, 2019–21. Plaintiffs' Motion does not identify what specific "insurance policy information" they seek, let alone from what period. *See generally* ECF No. 32. Nor do Plaintiffs explain how the information would raise any new factual issues not addressed by Defendant Ocwen's loan analyst's affidavit, the CPA retained by Sharon in *Clare County I*, or the report issued by Boge, Wybenga, and Bradley, that "review[ed] the parties' evidence" to determine the "remaining amount owed on the mortgage," ECF No. 31-14 at PageID.1506–07. More to the point, Plaintiff's motion does not address why these records were not—or could not have been— obtained in *Clare County I*. But regardless of how relevant these documents may be, Plaintiffs' Motion does not comply with procedural requirements for motions to compel discovery. So the Motion will be denied.

### A.

Before addressing Plaintiffs' Motion, a background on the procedural requirements for motions to compel and the remedies for violating them is necessary.

At its core, Civil Rule 37 "establishes the mechanisms by which" other discovery rules "can be made effective." 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *Federal Practice & Procedure* § 2281 (3d ed. 1998). To that end, Civil Rule 37 authorizes motions to compel discovery when a party does not adequately respond to a discovery request. *See* FED. R. CIV. P. 37(a)(1)–(4). But before filing such a motion, movants must "in good faith" attempt to "confer" with the opposing party to resolve the issue. *See* FED. R. CIV. P. 37(a)(1); *see also Sweeting v. Schweigtzer*, No. 19-3930, 2020 WL 5822513, at *3 (6th Cir. July 31, 2020). And moving parties must include a certification in their motion to compel that details these efforts. *Id.*; *see also Parks v. Lyash*, No. 22-5841, 2023 WL 6237062, at *9 (6th Cir. Apr. 12, 2023); *Naviant Mktg. Sols., Inc. v. Larry Tucker, Inc.*, 339 F.3d 180, 186 (3d Cir. 2003).

These procedural requirements are not trifling technicalities. Instead, they implement the Civil Rules' recurring preference for litigants to use cost-saving, extrajudicial efforts to resolve discovery disputes before seeking judicial intervention. *See* FED. R. CIV. P. 1, 26(c)(1), 37(a)(1), 37(d)(1)(B); *see also* 8B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *Federal Practice & Procedure* § 2285 (3d ed. 1998); *In re Johnson*, 408 B.R. 115, 120 (Bankr. S.D. Ohio 2009). And more to the point, they expect professionals to manage discovery, well, professionally, rather than requesting a court "to expend its energies when the parties have not sufficiently expended their own." *Hasbro, Inc. v. Serafino*, 168 F.R.D. 99, 101 (D. Mass. 1996); *see also Boulder Falcon, LLC v. Brown*, 345 F.R.D. 511, 526 (D. Utah 2023) ("[M]eeting and conferring first to avoid litigation later saves the parties, their counsel, the court, and the taxpayers the hassle and expense of further litigation.").

Courts vary on how to proceed when the movant does not follow Civil Rule 37(a)(1)'s meet-and-confer and certification commands. *In re Energy Conversion Devices, Inc.*, 659 B.R. 103, 111 (Bankr. E.D. Mich. 2024) (noting this divide). Indeed, three distinct approaches to this issue emerge from federal case law, and Eastern District of Michigan cases have applied all three.

First, some courts have held that when a movant "fails to satisfy the requirements of Rule 37(a)(1)," the motion to compel "must be denied." *E.g.*, *In re Johnson*, 408 B.R. at 122. Consider this the "must-deny" approach. In essence, courts adopting the must-deny approach treat these meet-and-confer requirements as prerequisites to filing a motion to compel discovery—without clearing these hurdles, the entire motion is defective, and the court cannot consider the motion's merits. *See, e.g., id.* at 119–22; *see also Robinson v. Potter*, 453 F.3d 990, 995 (8th Cir. 2006) ("Before the court can rule on a motion [to compel], the parties must demonstrate they acted in

good faith to resolve the issue among themselves."); *see also* WRIGHT & MILLER, *Federal Practice & Procedure* § 2285 (collecting cases).

Second, many courts take a "may-deny" approach when a movant fails to satisfy Civil Rule 37(a)(1)'s requirements. *See, e.g.*, *Benavidez v. Sandia Nat'l Lab'ys*, 319 F.R.D. 696, 723 (D.N.M. 2017) (citing *Robison v. Transamerica Ins. Co.*, 368 F.2d 37, 39 (10th Cir. 1966)). Under the may-deny approach, courts have the discretion to consider the motion to compel's merits or deny the motion outright. Although the Sixth Circuit has not squarely addressed this issue, it seemingly applied this approach in three unpublished cases. *See Pullen v. Maynard*, No. 16-4154, 2017 WL 10671148, at *3 (6th Cir. Nov. 28, 2017) (noting that the "[t]he district court" did not abuse its discretion when it "denied [movants] . . .  motions to compel discovery because [movant] failed to comply with [Civil] Rule 37(a)(1)['s]" requirements); *Sweeting*, 2020 WL 5822513, at *3 ("A party may file a motion to compel . . . discovery only after he has . . . attempted in good faith to confer with the [opposing party] to obtain the discovery. Because [the movant] made no showing that he had . . . attempted to confer with them, the district court did not abuse its discretion by" denying the motion to compel.); *Parks*, 2023 WL 6237062, at *9 ("[T]he district court properly disposed of three motions due to [movant's] noncompliance with [Civil Rule 37(a)(1)'s] procedural requirements.").

Third, other courts adopt a "must-consider" approach when a movant fails to heed Civil Rule 37(a)(1)'s requirements. *See, e.g.*, *Ryan v. Nagy*, No. 2:20-CV-11528, 2022 WL 21988830, at *2–3 (E.D. Mich. Oct. 11, 2022) (citing *Frontier-Kemper Constructors, Inc. v. Elk Run Coal Co., Inc.*, 246 F.R.D. 522, 526 (S.D. W. Va. 2007)). Unsurprisingly, under the must-consider approach, a court must consider the motion to compel's merits, and "the moving party simply forgoes any right to recover their expenses in [filing] the motion, as provided in [Civil] Rule

37(a)(5)(A)(i)." *Id.* at *2. This approach seems to be the most consistent with Civil Rule 37, and

two Eastern District of Michigan cases have explained why:

> Although [Civil Rule 37] requires parties to attempt to confer with the opposing party before filing a motion to compel, the Rule does not explicitly make this a precondition to a motion to compel. FED. R. CIV. P. 37(a)(1). Quite the opposite, it implies that courts can consider motions to compel even where the moving party fails to certify his or her efforts to confer with opposing counsel. *See* FED. R. CIV. P. 37(a)(5)(A)(i). Indeed, [Civil] Rule 37 provides that movants who fail to confer with opposing counsel before filing motions to compel forfeit their right to reimbursement for the costs of their motion, should they prevail. *Id.* Thus, [Civil] Rule 37(a)(5)(A)(i) presupposes that courts may consider motions to compel [that] do not comply with [Civil] Rule 37(a)(1)'s certification requirement. *Id.* [Civil] Rule 37(a)(5)(A)(i) would be meaningless if [Civil] Rule 37(a)(1) meant that a court cannot grant a motion to compel unless the moving party certified his or he efforts to confer with opposing counsel. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 27, at 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").
>
> There are only two interpretations of [Civil] Rule 37 that avoid this conflict. The first and most straightforward interpretation is that [Civil] Rule 37(a)(5)(A)(i) provides the exclusive remedy where a party violates the certification requirement in [Civil] Rule 37(a)(1). The second way a court may avoid this conflict is by taking the view that it has discretion to deny or entertain a motion to compel where the moving party violates [Civil] Rule 37(a)(1). Thus, a court may deny a motion to compel [that] violates Rule 37(a)(1), but if it chooses to entertain the motion, then [Civil] Rule 37(a)(5)(A)(i)'s penalty comes into play.
>
> But there is no textual support for this second interpretation in [Civil] Rule 37. The Rule lacks any language suggesting that courts have discretion to waive Rule 37(a)(1)'s certification requirement. *See* FED. R. CIV. P. 37. Rather, the moving party "must" make a good faith attempt to confer with opposing counsel. FED. R. CIV. P. 37(a)(1). This provision is mandatory, and Rule 37 provides just one penalty for a violation of this requirement—forfeiture of the moving party's ability to recover their expenses in filing the motion. FED. R. CIV. P. 37(a)(5)(A)(i). Accordingly, [courts] must still consider [a movant's] motion to compel despite his failure to confer . . . .

*Id.* at *2–3; *Fluker v. Dunn*, No. 2:23-CV-10617, 2024 WL 479597, at *2–3 (E.D. Mich. Feb. 7,

2024).

Nonetheless, where, as here, local rules also govern procedural requirements for motions

to compel, the local rules may broaden a court's options. *See, e.g.*, *Khalil v. Transunion, LLC*, No.

08-10303, 2008 WL 4642857, at *3 (E.D. Mich. Oct. 20, 2008) (applying both Local Rule 7.1 and Civil Rule 37(a)(1) to a motion to compel discovery); *see also Naviant Mktg. Sols., Inc.*, 339 F.3d at 187. Indeed, in the Eastern District of Michigan, Local Rule 7.1(a) incorporates Civil Rule 37(a)(1)'s requirements and affords judges broad discretion on how to enforce them. Specifically, it provides that "[b]efore filing a motion relating to discovery, the movant must comply with [Civil Rule] 37(a)(1)." E.D. Mich. LR 7.1(a)(1). The rule then permits judges to impose sanctions "for violating [the] rule," including "taxing costs and attorney's fees, denying the motion, and striking the motion." E.D. MICH. LR 7.1(a)(3). In this way—even if Civil Rule 37's text suggests that the must-consider approach prevails when considering Civil Rule 37 alone—when one considers Civil Rule 37 and Local Rule 7.1(a)'s meet-and-confer requirements in tandem, the two rules authorize the may-deny approach.

This conclusion does not conflict with the two Eastern District of Michigan cases that have taken the must-consider approach. *See Ryan*, 2022 WL 21988830, at *2–3; *Fluker*, 2024 WL 479597, at *2–3. Indeed, in both those cases, the court addressed motions to compel filed by prisoners, who are *exempt* from Local Rule 7.1's meet-and-confer requirements. *See Ryan*, 2022 WL 21988830, at *2–3; *Fluker*, 2024 WL 479597, at *2–3; *see also* E.D. MICH. LR 7.1(a)(2)(D). And both cases noted, albeit in footnotes, that the decisions were focused on situations where only Civil Rule 37(a)(1) applies. *See Ryan*, 2022 WL 21988830, at *2, n.2 ("If Defendants' argument has any force at all, it is because of the requirements imposed by [Civil Rule 37], not this Court's local rules."); *Fluker*, 2024 WL 479597, at *2, n.1 (same).

At bottom, in the Eastern District of Michigan, when a party moving to compel discovery flouts Civil Rule 37(a)(1) and Local Rule 7.1(a)'s meet-and-confer and certification requirements, a court may deny the motion without considering its merits.

**B.**

Against that legal backdrop, Defendants argue that Plaintiffs did not comply with meet-and-confer rules, so Plaintiffs' Motion should be denied. *See* ECF No. 36 at PageID.2042–45. Accordingly, this Court must determine (1) whether Plaintiffs met their meet-and-confer obligations under Civil Rule 37(a)(1) and Local Rule 7.1, and, if not, (2) whether this noncompliance warrants denying Plaintiffs' Motion without considering its merits, or whether a different remedy is appropriate. *See supra*, Section II, A. These determinations are addressed in turn below.

**1.**

Starting with whether Plaintiffs satisfied the meet-and-confer and certification requirements, this Court finds that they did not. Recall that Civil Rule 37(a)(1) and Local Rule 7.1 require parties to (1) make good faith efforts to confer with the opposing party to resolve the discovery issue before filing a motion to compel, and (2) include certification in their motion stating that they made such efforts. *See* FED. R. CIV. P. 37(a)(1); E.D. Mich. LR 7.1(a)(1)–(3); *see also Sweeting*, 2020 WL 5822513, at *3. Plaintiffs did neither.

For starters, Plaintiffs did not include in their Motion a certification stating that they made a good faith effort to resolve the discovery dispute with Defendants before filing their Motion. *See generally* ECF No. 32. True, they attach as exhibits excerpts from two email threads between Plaintiffs' Counsel and Defense Counsel showing that they notified Defense Counsel of Plaintiffs' belief that a dispute existed and that they would "proceed[] with a motion." *See* ECF No. 32-1. But these exhibits are neither certifications nor *in* Plaintiffs' Motion, as both Civil Rule 37(a)(1) and Local 7.1(a) require. *See In re Johnson*, 408 B.R. at 121 (finding attached correspondence between parties did not satisfy the certification requirement because "[i]t is the movant's responsibility to certify its good faith efforts to confer and resolve, not the Court's to search

through attached correspondence and interpret emails and letters to determine whether movant has satisfied its Rule 37(a)(1) obligation"); FED. R. CIV. P. 37(a)(1) ("The *motion* [to compel] must include a *certification* that the movant has in good faith conferred or attempted to confer with" the opposing party "in an effort to obtain it without court action." (emphasis added)); E.D. Mich. LR 7.1(a)(2)(A) ("If concurrence is not obtained the *motion* . . . must state . . . there was a *conference* between attorneys . . . .") (emphasis added).

Even so, Plaintiffs have not shown that they actually made *good faith* efforts to resolve the "dispute" before filing their Motion. In fact, discovery materials and emails in the record suggest that Plaintiffs' Counsel refused to do so. To start, Plaintiffs waited to propound requests for production until less than a month before discovery closed in this case. *Compare* ECF No. 36-5 at PageID.2222–26 (Plaintiffs' propounded requests sent on December 17, 2024) *with* ECF No. 28 at PageID.1059 (scheduling discovery cutoff on January 14, 2025). Even though Plaintiffs previously litigated three other cases spanning nearly five years with heaps of documents produced and reviewed and three audits of Sharon's account, Plaintiffs want more information. And Plaintiffs' request is sweeping. Plaintiffs seek, among other things, "all insurance policies, all proof of payment of insurance," and several other broad categories of information. *See* ECF No. 36-5 at PageID.2222–26. In response, Defendants produced hundreds of documents and returned timely objections, contending that some requests were overbroad and irrelevant. *See* ECF Nos. 36-4; 36-3.

Following Defendants' production and objections, Counsel exchanged a series of emails, during which Defense Counsel repeatedly requested to meet and confer with Plaintiffs' Counsel about the discovery issues to no avail. These emails are listed below:

- On January 24, 2025, at 1:03 PM, Plaintiffs' Counsel sent Defense Counsel an email stating, "Please allow this email to serve as a formal notice and request that you supply

outstanding documents to my discovery. . . . As I am sure you are aware, most importantly[,] you have failed to supply thie [*sic*] insurance information. . . . Please note: IF I DO NOT HAVE FULL AND COMPLETE[,] AND LEGIBLE RESPONSES BY THE END OF THE DAY, I WILL FILE A MOTION TO COMPEL." ECF No. 36-7 at PageID.2231 (emphasis in original).

- On January 24, 2025, at 4:36 PM, Plaintiffs' Counsel sent Defense Counsel a second email stating, "Please consider this email a formal request for concurrence on a Motion to Compel discovery responses . . . ." ECF No. 36-8 at PageID.2233.

- On January 24, 2025, at 4:38 PM, Defense Counsel responded to Plaintiffs' Counsel's first email stating, "As for the insurance documents, the request is overbroad and not part of the dispute at hand. . . . In any event, I am in receipt of your settlement demand and think it would be a more efficient use of our time to finalize settlement discussions before engaging in costly discovery disputes. If you disagree, I ask that we have a meet and confer regarding the specific challenges to responses. A demand that we provide a response by the end of the day is not reasonable." ECF No. 36-7 at PageID.2231.

- On January 24, 2025, at 4:47 PM, Defense Counsel responded to Plaintiffs' Counsel's second email stating, "I do not believe this is a sufficient meet and confer regarding a motion to compel. Per my last email, I think a phone call to discuss your demand is necessary. In particular, your claim for 'insurance documents' is overly broad . . . ." ECF No. 36-8 at PageID.2233.

- On February 3, 2025, at 4:29 PM, Plaintiffs' Counsel sent Defense Counsel a third email stating, "As you have been previously advised, you have failed to provide discovery in accordance with the Michigan Rules of Court. I have contacted you multiple times on this, and you have not made any effort to correct or address the issues. I will be proceeding with a motion and contacting the court to seek costs, sanctions as well as to request a special conference." ECF No. 36-10 at PageID.2237.

- On February 3, 2025, at 4:34 PM, Plaintiffs' Counsel sent Defense Counsel a fourth email stating, "Please consider this a formal request to stipulate to an order delay[ing] Plaintiff[s'] response to your motion for Summary Disposition until after the Motion to Compel Discovery and Special Conference has occurred." ECF No. 36-9 at PageID.2235.

- On February 4, 2025, at 10:49 AM, Defense Counsel replied to Plaintiffs' Counsel's fourth email stating, "We cannot agree to an extension. As noted previously, I am happy to call to go through your objections to our discovery. Further, the motion is based primarily upon law and your requests, as noted in my objections, are irrelevant to the subject matter." ECF No. 36-9 at PageID.2235.

- On February 4, 2025, at 10:50 AM, Defense Counsel replied to Plaintiffs' Counsel's email stating, "The last email I sent you asked that we have a call to discuss. I have not received a call or voicemail asking to discuss your objections." ECF No. 36-10 at PageID.2237.

- On February 5, 2025, Plaintiffs file their Motion to compel Defendants to produce "insurance records." ECF No. 32.

Besides those emails, the Parties provided no other information about their efforts to define, narrow, or resolve their dispute. And these perfunctory emails do not demonstrate a *good-faith* attempt to resolve the dispute without court intervention.

Not to mention, the emails highlight another prefiling defect: the lack of "conferral" within the meaning of the relevant rules. Under Civil Rule 37(a)(1), absent a showing that other communication methods would be futile, parties do not "confer" with one another when they do no more than send the opposing party token emails. *See In re Johnson*, 408 B.R. at 121 (emails and a letter alone were insufficient to constitute "conferment" under Civil Rule 37(a)(1)); *Benavidez*, 319 F.R.D. at 723 (parties do not "meet and confer" under Civil Rule 37(a)(1) "by exchanging cursory and perfunctory emails or letters" that "simply restate each other's positions on the items of discovery"); *see also* WRIGHT & MILLER, *Federal Practice & Procedure* § 2285 (collecting cases). And committee comments for Local Rule 7.1 interpret Local Rule 7.1(a)'s meet-and-confer requirements similarly:

> LR 7.1(a) requires that a moving party conduct a meaningful and timely conference with other parties to explain the nature of the relief sought and the grounds for the motion, to seek concurrence, and to narrow the issues. The Court's strong preference is for conferences held in a manner that facilitates discussion and debate, such as in person, by video, or by telephone. Sometimes, email exchanges may suffice if the motion is rudimentary and uncomplicated, or to document conversations. But sending an email without engaging the other parties will not satisfy this rule.

E.D. Mich. LR 7.1 cmt. As a result, not only do Plaintiffs' Counsel's emails lack any indicia of good-faith effort to resolve the discovery dispute, but they also fail to satisfy Civil Rule 37(a)(1) and Local Rule 7.1(a)'s threshold for what it means to "confer" with an opposing party.

In sum, Plaintiffs did not satisfy Civil Rule 37(a)(1) and Local Rule 7.1(a)'s procedural requirements before filing their Motion to Compel. Plaintiffs did not include a certification in their

Motion stating that they made good faith efforts to meet and confer with Defendants to resolve their discovery dispute before filing the motions. Nor did Plaintiffs demonstrate that they actually made such efforts.

## 2.

Because Plaintiffs did not comply with Civil Rule 37(a)(1) and Local Rule 7.1(a)'s procedural requirements before filing their Motion, this Court must determine whether it will deny the Motion without considering the merits under Local Rule 7.1(a)(3). It will.

Here, Plaintiffs' procedural noncompliance was particularly egregious. Plaintiffs spurned every meet-and-confer requirement they could: (1) they did not make good faith efforts to resolve their discovery dispute before dashing to court; (2) any efforts they made did not constitute meeting and conferring with Defendants; and (3) they did not include a Civil Rule 37(a)(1) certification in their Motion. And Plaintiffs' Counsel apparently ignored Defense Counsel's repeated requests to meet and confer and warnings that her perfunctory emails did not satisfy meet-and-confer requirements. *See* ECF Nos. 36-7; 36-8; 36-9; 36-10. At bottom, Plaintiffs ask this Court "to expend . . . energies" settling a discovery dispute when they have repeatedly refused to do so. *Hasbro, Inc.*, 168 F.R.D. at 101. As a result, Plaintiffs' Motion seeking an order compelling Defendants to produce all insurance policy information, ECF No. 32, will be denied, and Plaintiffs will be directed to file a response to Defendants' Motion for Summary Judgment, ECF No. 31.

## III.

Moving to Plaintiffs' Motion for a TRO. ECF No. 39. Although somewhat unclear, Plaintiffs ultimately seek "an order preventing" Defendants from "further transfer[ing] . . . the real property" that is "the subject of this litigation." *Id.* at PageID.2244. To that end, Plaintiffs argue that Defendants have stated that they may seek to evict Sharon, and the TRO would prevent them

from doing so. *See id.* at PageID.2243; *see also* ECF No. 41-1 at PageID.2366. But like their Motion to Compel, Plaintiffs' Motion for a TRO features fatal flaws.

A Court may issue a TRO without notice to the adverse party only if the movant sets forth "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and if "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).

If the movant clears those procedural hurdles, then courts can move to the merits. In determining whether to grant a TRO, a court must weigh four factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent [a TRO], (3) whether granting the [TRO] would cause substantial harm to others, and (4) whether the public interest would be served by granting the [TRO]." *A & W X-Press, Inc. v. FCA US, LLC*, No. 21-1805, 2022 WL 2759872, at *3 (6th Cir. July 14, 2022); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). The TRO standard is "logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

Here, Plaintiffs' have not established that they are at risk of imminent, irreparable harm. Although Plaintiffs allege that Defendants *may* seek to evict Sharon, they do not allege that Defendants have initiated eviction proceedings, which Michigan law requires before someone may be evicted. *See* MICH. COMP. LAWS § 600.5714(1)(g) (requiring one to initiate proceedings to "recover possession" of property when "a person continues in possession of premises sold by

virtue of a mortgage or execution, after the time limited by law for redemption of the premises"). More to the point, without Defendants commencing these eviction proceedings—which would take time and require a judicial determination before eviction, *see* MICH. COMP. LAWS §§ 600.5735, 600.5741—Plaintiffs face nothing more than "an unfounded fear" of imminent harm. *Sheldon v. Vilsack*, No. 11-10487, 2011 WL 611891, at *2 (E.D. Mich. Feb. 11, 2011) (noting that a party must establish an imminent and "realistic prospect of homelessness" to "constitute a" founded "threat of irreparable harm" for preliminary injunctive relief purposes).

And at any rate, even if Defendants had initiated eviction proceedings, this Court could prevent them from doing so. Under the Anti–Injunction Act, 28 U.S.C. § 2283, a federal court "may not grant an injunction to stay proceedings in a State court," subject to certain exceptions that do not apply here. *See Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 844 (6th Cir. 2009). Here, the thrust of Plaintiffs' request for injunctive relief is to thwart state-court eviction proceedings. *See generally* ECF Nos. ECF No. 39 at PageID.2243–44; 41-1 at PageID.2366. But this Court has "repeatedly held that the Anti–Injunction Act bars injunctions preventing state-court eviction proceedings," precluding Plaintiffs' requested relief. *Powers v. Bank of Am., N.A.*, 63 F. Supp. 3d 747, 752 (E.D. Mich. 2014).

In short, Plaintiffs have not established that they face imminent, irreparable harm without a TRO. And even if they did, based on Plaintiffs' alleged harm, this Court does not have the authority to issue the injunctive relief they seek—effectively an injunction of state-court proceedings. So Plaintiffs' Motion for a TRO, ECF No. 39, will be denied.

## IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Special Expedited Conference Due to Defendant's Failure to Provide Discovery, ECF No. 32, is **DENIED IN PART** to the extent it seeks an order compelling Defendants to provide Plaintiffs' requested insurance records.

Further, it is **ORDERED** that Plaintiffs' Motion for Special Expedited Conference Due to Defendant's Failure to Provide Discovery, ECF No. 32, is **GRANTED IN PART** to the extent it seeks an extension to respond to Defendants' Motion for Summary Judgment.

Further, it is **ORDERED** that Plaintiffs are **DIRECTED** to file a response to Defendant's Motion for Summary Judgment, ECF No. 31, **on or before May 27, 2025**.

Further, it is **ORDERED** that Defendant is **PERMITTED** to file a reply to Plaintiffs' response **on or before June 10, 2025**.

Further, it is **ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 39, is **DENIED**.

**This is not a final order and does not close the above-captioned case.**

Dated: May 5, 2025                                    s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge