UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHARON CURTIS, and JANETTE CURTIS,

                Plaintiffs,                        Case No. 1:23-cv-12859

v.                                             Honorable Thomas L. Ludington
                                              United States District Judge

DEUTSCHE BANK, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE**

This case arises from a 2019 mortgage foreclosure initiated by a power of sale and a County of Clare, Michigan, Sheriff's Sale of Plaintiff Sharon Curtis's ("Sharon") residential property. Following the Sheriff's Sale, Sharon and her daughter, Plaintiff Janette Curtis, have filed four separate lawsuits against the mortgagee, Defendant Deutsche Bank, and the companies that serviced the loan, Defendants Ocwen Financial Corporation and PHH Mortgage Corporation. Ultimately, Plaintiffs have challenged the unpaid loan balance secured by the mortgage in the lawsuits.

Plaintiffs' lawsuits have had a bizarre, maze-like history, with Plaintiffs turning from one court to another to air Sharon's alleged grievances. As a result, a brief, bullet-point roadmap of these cases is needed before a deeper dive into the specifics of the cases:

- On August 12, 2004, Sharon obtained a loan for $59,700 from Ameriquest Mortgage Company (Ameriquest) to renovate her property located at 166 E. Pine, Harrison, Michigan, and Ameriquest secured the loan with a mortgage on the property.

- In March 2013, Ameriquest assigned the lender and mortgagees' interests to Defendant Deutsche Bank, and Defendant Ocwen began servicing the loan.

- In 2018, Sharon defaulted on her loan repayment.

- In early 2019, Defendant Ocwen—which was in the process of merging with Defendant PHH—implemented a temporary repayment plan, requiring a monthly payment of $514.19 on the first of each month until the loan was current. Once again, Sharon defaulted on the repayment plan, so Defendant Ocwen canceled the plan.

- On December 4, 2019, Clare County Sheriff's Deputy conducted a foreclosure auction according to Defendant Deutsche Bank's power of sale in the mortgage. Defendant Deutsche Bank received a Sheriff's Deed for the property after placing the highest bid for $39,900.

- On February 14, 2020, Plaintiffs sued Defendants Deutsche Bank, Ocwen, PHH, and one of PHH's subsidiaries in state court in the 55th Circuit Court in Clare County, Michigan (*Clare County I*), asserting six claims, including one federal claim.

- On March 6, 2020, Defendants removed the case to the United States District Court for the Eastern District of Michigan, where the case was assigned to Judge Sean F. Cox (*Federal I*).

- On June 1, 2020, the five state claims were remanded to the state court in *Clare County I*.

- On November 6, 2020, Judge Cox dismissed *Federal I*'s remaining claim because Plaintiffs failed to state a viable claim.

- On October 12, 2022, a CPA accounting firm was appointed as an independent expert to help resolve the remanded claims in *Clare County I*.

- On October 2, 2023, the appointed accounting firm in *Clare County I* completed a report concluding that the loan payoff balance was now $81,895.87.

- On November 9, 2023, Plaintiffs filed this case (*Federal II*) against Defendants, asserting two claims: one under the Real Estate Settlement Procedures Act (RESPA) and the other under the Truth in Lending Act (TILA). The claims allege that loan account statements that were filed in *Clare County I* included fraudulent property inspection and insurance escrow charges.

- On January 26, 2024, Defendants moved to dismiss *Federal II* based on federal abstention principles. The motion was denied because "no Party ha[d] summarized the status of the [*Clare County I*] with clarity, nor ha[d] either Party provided a detailed explanation of which factual or legal issues—if any—[were] being adjudicated in state court at th[at] point, or specified how those issues overlap[ped] with Plaintiffs' RESPA and TILA claims in federal court." ECF No. 21 at PageID.1026.

- On February 21, 2024, Plaintiffs filed a second state court case in the 55th Circuit Court (*Clare County II*) against Defendants and their attorneys, asserting they tortiously interfered with Sharon's insurance policy on the property in dispute.

- On March 12, 2024, the Parties reached a settlement in *Clare County I* and placed the material terms on the record. The Parties stipulated to a loan payoff amount of $85,041.72 plus per diem interest and any additional fees that accrued before the settlement was finalized.[1]

- On September 30, 2024, the Parties resolved their disputes over the final settlement language in *Clare County I* and further explained their settlement on the court's record.

- On November 26, 2024, *Clare County II* is dismissed because Plaintiffs' complaint failed to state a viable claim and the claims were found to be frivolous.

- On January 3, 2025, the state court entered a final order effectuating the settlement in *Clare County I*. Defendants moved to amend the order. Sharon moved for reconsideration of the order, arguing that the stipulated payoff amount of $85,041.72 before interest and additional fees relied on the insurance escrow charges that Plaintiffs allege are fraudulent in *Federal II*.

- On January 16, 2025, Defendants move for summary judgment in *Federal II*, arguing, among other things, that preclusion doctrines bar Plaintiffs' claims.

- On February 5, 2025, Plaintiffs filed a motion to compel Defendants to produce all insurance records related to Sharon's loan and escrow account in *Federal II*.

- On February 7, 2025, the state court granted Defendants' motion to amend and denied Sharon's motion for reconsideration in *Clare County I*, issuing a modified final order, providing that the case is dismissed with prejudice, Sharon's loan payoff amount is $85,041.72 plus interest and fees, Sharon is entitled to $22,000 in consideration for the settlement, and the 2019 Sheriff's Sale will be rescinded once Sharon repays her loan with funds from her "anticipated" lender.[2]

- On March 31, 2025, Plaintiffs file a motion for a temporary restraining order (TRO) in *Federal II*. According to Plaintiffs, the loan payoff amount has now surpassed $93,000, after accounting for unpaid interest and fees.

---

[1] While Sharon's promissory note and mortgage both provide for recovery of legal expenses incurred in enforcing the note and mortgage, they do not appear to have been included in Sharon's payoff amount. Equally significant is that the settlement did not seem to address a deficiency judgment for the difference between the unpaid loan balance and Defendant Deutsche Bank's Sheriff Sale bid for $39,900.

[2] The papers do not explain the justification for Defendants' $22,000 payment to Sharon. In executing their settlement, both Defendants and Plaintiffs appear to rely on Sharon's representation that she has an available lender to refinance the property and assertions that "as Defendant[s] [are] fully aware, Plaintiffs have been ready, willing[,] and able to close for over three years." ECF No. 32 at PageID.2020.

- On May 5, 2025, Plaintiffs' Motion to Compel and Motion for a TRO were denied in *Federal II*. Plaintiffs were then directed to submit a response to Defendants' pending Motion for Summary Judgment, which they did not timely do.

Moving from that roadmap to the road, as noted, Plaintiffs filed their first complaint in *Clare County I* on February 14, 2020. Their complaint included several claims, including one federal claim under RESPA. Defendants removed that case to the United States District Court for the Eastern District of Michigan, creating *Federal I*. That case did not last long: in November 2020, the court in *Federal I* dismissed the RESPA claim for failure to state a claim and remanded the remaining state claims to the Clare County Circuit Court.

The Parties then continued in *Clare County I*—the remanded state claims—for over three years. After Plaintiffs amended their complaint in August 2021, the state court dismissed most of their claims but allowed two claims to proceed: a demand for an accounting claim and a quiet title claim. During the litigation of those claims, a loan analyst for Defendant Ocwen submitted an affidavit detailing Sharon's loan history and attached extensive account records that led to the 2019 Sheriff's Sale. Those materials placed Sharon's unpaid balance at roughly $75,000 as of November 10, 2022. The court ultimately appointed a CPA accounting firm as an independent expert to conduct an informal audit of Sharon's loan account at the Parties' expense to resolve the remaining claims.

In November 2023—one month after the appointed expert issued its report in *Clare County I*—Plaintiffs marched back to federal court and filed this case, *Federal II*. Plaintiffs advance a RESPA claim and TILA claim grounded in supposed inaccuracies in her loan records litigated in *Clare County I*. Notably, some of the alleged inaccuracies stem from 2013 transactions, while others stem from transactions beginning in January 2020. Nonetheless, Plaintiffs maintain that these records contain fraudulent property inspection expenses and insurance escrow charges that inflated Sharon's loan payoff.

After the Parties filed preliminary motions in *Federal II*, they returned to state court. In February 2024, Plaintiffs filed a second case in state court, *Clare County II*. In *Clare County II*, Plaintiffs advanced two tortious interference claims against Defendants and their attorneys, alleging that they tortiously interfered with Sharon's insurance coverage for the mortgaged property. The state court dismissed *Clare County II*, concluding that Plaintiffs' claims were frivolous.

Meanwhile, the Parties settled *Clare County I* at a hearing in March 2024, stipulating to a payoff amount for Sharon's loan. The state court directed the Parties to submit a proposed order to effectuate the settlement. Yet months passed without the Parties submitting a proposed order, so the state court held a follow-up hearing in September 2024. At that hearing, the Parties contested many ancillary terms of the settlement but assured that the stipulated payoff amount remained agreeable. After Defendants compromised on the settlement's language, the state court redirected the Parties to submit a proposed order effectuating the finalized terms.

On January 3, 2025, the state court entered an order effectuating the settlement in *Clare County I*. The order rescinded the 2019 Sherriff's Sale, directed Sharon to repay her loan at the stipulated $85,041.72 plus interest and fees, directed Defendants to pay an agreed $22,000 in consideration for the settlement, and dismissed the case with prejudice. Defendants moved to amend the order to require Sharon to refinance and repay the loan before the court would rescind the 2019 Sheriff's Sale. In short, Defendants sought to avoid Sharon accepting the settlement consideration of $22,000 without repaying her loan. Sharon, for her part, moved for reconsideration of the order, arguing that when the Parties calculated the stipulated loan payoff amount, they mistakenly relied on the charges that she alleges are fraudulent in this case.

On February 7, 2025, the state court denied Sharon's motion for reconsideration and granted Defendants' motion to amend the judgment. In so doing, it modified its January 3, 2025 order to condition the rescission of the 2019 Sheriff's Sale on Sharon's payment of the loan within 30 days of receiving the payoff funds from her anticipated lender. Once Sharon completed her responsibilities, Defendants would notify the court, which, in turn, would rescind the Sheriff's Sale.

The Parties have now pivoted back to *Federal II*. Following the *Clare County I* dismissal, Defendants moved for summary judgment in *Federal II*, contending, among other things, that the doctrines of *res judicata* and collateral estoppel bar Plaintiffs' RESPA and TILA claims. In response, Plaintiffs filed a motion seeking (1) a stay of their deadline to respond to Defendants' Motion for Summary Judgment and (2) an order compelling Defendants to produce all insurance records related to the escrow charges in Sharon's loan repayment statements. This Court stayed Plaintiffs' deadline to respond to Defendants' Motion for Summary Judgment until it addressed Plaintiffs' Motion. Soon after, Plaintiffs filed a motion for a TRO precluding future transfers of the property in dispute. This Court ultimately denied Plaintiffs' Motion seeking an order to compel Defendants to produce the sought records. Plaintiffs' Motion for a TRO was also denied.

That leaves Defendants' Motion for Summary Judgment. For the reasons explained below, Defendants' Motion for Summary Judgment will be granted. As a result, this case will be dismissed.

# I.

## A. 2004–2019: Sharon's Mortgage, Default, and Sheriff's Sale

In August 2004, Plaintiff Sharon Curtis and her former spouse, Neal Curtis,[3] obtained a loan for $59,700.00 from Ameriquest Mortgage Company to remodel their home on Pine Street in Harrison, Michigan. *See* ECF Nos. 1-4 at PageID.47; 31-2 at PageID.1108. Under the loan promissory note, Sharon and Neal agreed to make monthly payments of $397.19 until the loan was paid or until the loan's promissory note matured on September 1, 2034, at which point she would pay the remaining balance. ECF No. 1-4 at PageID.47. The promissory note and the mortgage securing repayment of the note also contained relatively standard default language. *Id.* at PageID.47–48; *see also* ECF No. 31-10.

Ameriquest's mortgage, for its part, contained a power of sale and payment acceleration provisions if Sharon defaulted on the loan. ECF No. 31-10 at PageID.1466, 1477. In March 2013, Ameriquest assigned the lender's interest, including this mortgage, to Defendant Deutsche Bank. ECF No. 31-11. Following the assignment, Defendant Ocwen Financial Corporation[4] became the loan servicer until 2019. ECF No. 40-4 at PageID.2354–55. Defendant Ocwen later merged with Defendant PHH Mortgage Corporation in 2019, at which point PHH began servicing the loan. *Id.* at PageID.2355.

Eventually, Sharon defaulted on the loan in 2018. *See* ECF No. 1-4 at PageID.42. After Sharon attempted to make partial payments from August 2018 to February 2019 that did not cure

---

[3] Neal Curtis, who has since passed away, no longer holds an interest in the relevant property. *See* ECF No. 40-4 at PageID.2354; *see also* ECF No. 31-7 at PageID.1360. Indeed, he and Sharon divorced in 2012, so in May 2013, Mr. Curtis executed a quit-claim deed transferring his property interest to Sharon. *Id.* Importantly, unless Ameriquest released Mr. Curtis from repayment of the loan, he—and eventually his estate—remained responsible for the loan's repayment.

[4] It appears Defendant Ocwen is now "Onity Group Inc." *See* ECF NO. 31-16 at PageID.1527.

the default, Defendant Ocwen returned the payments and implemented a temporary repayment plan. *Id.* at PageID.42–43; *see also* ECF No. 31-2 at PageID.1172–77, 1179–81, 1192–96. During the servicing transition between Defendants Ocwen and PHH, loan servicing representatives continued to send Sharon delinquency notices, some of which seemingly contained conflicting information about her repayment responsibilities. *See* ECF No. 31-2 at PageID.1181–82, 1198. But the repayment plan warned Sharon about these continued notices and explained Sharon's repayment obligation. *See id.* at PageID.1192–96. To that end, the plan required Sharon to make an initial down payment of $820.00 in March 2019. *See id.* After the down payment, the plan required Sharon to remit monthly payments of $514.19 on the first of each month, beginning May 1, 2019, through March 1, 2020, to bring the loan current. *See id.* The plan also provided that there were no unwritten terms, "no grace period[s]" for the payment due dates, and if the plan's terms were not satisfied, it would "be automatically canceled." *See id.* at PageID.1194, 1196. Yet despite these provisions, Sharon did not timely fulfill her repayment obligations, so the plan was canceled. *See* ECF No. 1-4 at PageID.43; *see also* ECF No. 31-2 at PageID.1182, 1196.

In October 2019, after sending Sharon additional delinquency notices, Defendant Deutsche Bank elected to exercise its power of sale and initiated foreclosure by advertisement procedures under MICH. COMP. LAWS § 600.3201 *et seq. See* ECF No. 31-2 at PageID.1213, 1222. Once Deutsche Bank published a satisfactory notice of foreclosure in a qualified newspaper for four successive weeks as required by MICH. COMP. LAWS §§ 600.3208, 600.3212, the Clare County Sheriff's Deputy conducted a public auction of Sharon's property on December 4, 2019. *See id.* at PageID.1220–24. As authorized by MICH. COMP. LAWS § 600.3228, Deutsche Bank participated in the auction, placed a credit bid for the property, and received a Sheriff's Deed. *See id.* at PageID.1220–25. And this Sheriff's Sale triggered a six-month redemption period under MICH.

COMP. LAWS § 600.3240(8), during which Sharon could redeem her property for $39,900 plus interest—the amount specified in Deutsche Bank's statutorily required purchaser's affidavit.[5] *See id.* at PageID.1225.

### B. 2020: *Clare County I*, Removal, Remand, and Federal Dismissal

Rather than exercising her right of redemption, Sharon and her daughter, Plaintiff Janette Curtis,[6] launched a campaign of litigation in multiple courts. On February 14, 2020, Plaintiffs sued Defendants Deutsche Bank, Ocwen, PHH, and one of PHH's subsidiaries in the 55th Circuit Court in Clare County, Michigan (*Clare County I*). *See* ECF No. 31-2. Sharon and Janette brought six claims: one federal claim under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et seq.*, and five state-law claims. *See id.* at PageID.1112–18. The focus of these claims was the allegation that loan servicing errors rendered the 2019 Sheriff's Sale voidable. *See id.*

On March 6, 2020, Defendants removed *Clare County I* to this Court (*Federal I*), contending that the RESPA claim provided federal question jurisdiction. ECF No. 31-3 at PageID.1263. The case was then assigned to Judge Sean F. Cox. *Id.* On June 1, 2020, Judge Cox declined to exercise supplemental jurisdiction over the five state claims, remanding them to the Clare County Circuit Court. *See Curtis, et al., v. Deutsche Bank National Trust Co., et al.*, Case No. 1:20-cv-10609 (E.D. Mich. June 1, 2020).

After remanding the state claims, Judge Cox dismissed *Federal I* on November 6, 2020. *See id.* at PageID.1273. His reasoning was two-fold. *See id.* at PageID.1267–72. First, Janette did not have standing to bring a RESPA claim because she was not the borrower under the operative

---

[5] Despite this Sheriff's Sale, Sharon has continued to live on the property in dispute. *See* ECF No. 41-1 at PageID.2366 (noting Sharon lives at the property and Defendants are currently "threatening to evict" her).

[6] Janette is also Sharon's guardian and conservator because Sharon is legally incapacitated. *See* ECF Nos. 1 at PageID.2–3; 41-1 at PageID.2365.

loan, and "'only a borrower on a loan'" can bring a RESPA claim. *Id.* at PageID.1267 (quoting *Keen v. Helson*, 930 F.3d 799, 804 (6th Cir. 2019)). Second, the complaint did not cite any specific RESPA provision that Defendants violated and failed to sufficiently allege facts to support any RESPA claim in the first instance. *Id.* at PageID.1267–72.

### C. 2021–2023: Remanded State Claims Continue in *Clare County I*

Following *Federal I*'s dismissal, Janette and Sharon "litigated" their five remanded state claims in state court in *Clare County I. See* ECF No. 31-4. In August 2021, they amended their complaint, adding four additional claims that asserted various tort theories under Michigan law. *See id.* at PageID.1292–94. But they did not add a TILA or RESPA claim. *See generally id.* In any event, after Defendants filed dispositive motions, the circuit court dismissed Janette because, as Judge Cox concluded in *Federal I*, she was not an obligor for the loan or owner of the relevant property and thus lacked standing to sue Defendants. *See* ECF No. 31-13 at PageID.1496–97. The court also dismissed seven of Sharon's nine claims, leaving just two claims to be resolved in *Clare County I*: (1) a demand for an accounting claim; and (2) a quiet title claim. *See id.* at PageID.1502; *see also* ECF No. 12-4 at PageID.934–35.

On November 10, 2022, in response to a report that concluded Sharon's loan servicing statements contained errors—prepared by a certified public accountant whom Sharon retained—a loan analyst for Defendant Ocwen filed an affidavit (the Affidavit) on behalf of Defendants. *See* ECF No. 1-4. The Affidavit explained that Sharon defaulted on her loan and why her repayment plan was terminated before the Sheriff's Sale. *See* ECF No. 1-4 at PageID.38–45, 88–90. In support of this explanation, the loan analyst attached Sharon's account statements that reflected her material account transaction history from February 2013 to July 1, 2022. *See id.* at PageID.76–86, 95–106; *see also* ECF Nos. 1-5 at PageID.107–72; 1-6 at PageID.173–231; 1-7 at PageID.232–316; 1-8 at PageID.317–93. Sharon received copies of many of these account statements on

January 16, 2018. *See* 31-16 at PageID.1928–38. And Sharon's Counsel received copies of the rest on July 6, 2022. *See* ECF No. 31-18. In addition to these account statements, the loan analyst attached a loan reinstatement and payoff quote, totaling—at that time—$75,047.80, which included unpaid principal, interest, escrow charges, and late fees. 31-16 at PageID.1920–26. The quote attached to the Affidavit warned that without repayments of the loan, interest would continue to accrue at a rate of $2.29 per day. *Id.* at PageID.1921.

Ultimately, the state court "found it necessary" to appoint a CPA accounting firm, Boge, Wybenga, and Bradley, as an independent expert "to review the parties' evidence" on the "remaining amount owed on the mortgage" at the Parties' expense. ECF No. 31-14 at PageID.1506–07. By the time the firm completed its report on October 2, 2023, as warned, the loan payoff amount had increased. *See* ECF No. 31-5 at PageID.1299. Indeed, the independent expert concluded that Sharon's loan payoff was $81,895.87, including unpaid fees and escrow charges. *Compare id. with* ECF No. 31-16 at PageID.1921.

### D. 2023–2024: *Federal II*

About a month after the independent expert issued its report—and while *Clare County I* proceeded—Plaintiffs Sharon and Janette marched back to federal court, filing this case, *Federal II*, on November 9, 2023. ECF No. 1. They bring two claims against Defendants Deutsche Bank, Ocwen, and PHH. *See id.* at PageID.5–8. First, Plaintiffs allege that Defendants violated RESPA's implementing regulation, 12 C.F.R. § 1024.17(c). *See id.* at PageID.5–6. Second, Plaintiffs allege Defendants violated the Truth in Lending Act (TILA)'s implementing regulation, 12 C.F.R. § 1026.36(c)(3).[7] *See id.* at PageID.6–8. Factually, Plaintiffs base these claims on the account

---

[7] Plaintiffs' Complaint indicates that the TILA claim is based on a violation of 36 U.S.C. § 1026.36(c)(3), a statute that does not exist. *See* ECF Nos. 1 at PageID.7; 21 at PageID.1025. But

statements attached to the Affidavit that Ocwen's loan analyst filed in *Clare County I. See id.* at

PageID.4–7 (citing ECF No. 1-4). To that end, they allege that two categories of "charges" in the

account statements inaccurately inflate Sharon's loan reinstatement payoff balance. *See id.* at

PageID.4–8.

First, Plaintiffs allege that Defendants fraudulently charged "multiple" $10.50 "property

inspection" fees "on the same day" in September 2013. *See id.* at PageID.5 (emphasis omitted);

*see also* ECF No. 1-4 at PageID.76. Notably, the account statements that Plaintiffs reference in

their Complaint reflect that the inspection fees were charged months before September 2013. ECF

No. 1-4 at PageID.76; *see also* 31-16 at PageID.1929–30. And the account statements' column

headings show that the September 2013 inspection transactions were *payments* made by Sharon—

*not* fraudulent charges imposed by Defendants:

| Date Payment Due | Date Payment Received | Date Assessed/ Transaction Date | Description | Amount Applied/ Assessed | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/ Other (See Description) | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/01/2012 | | | Beginning Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 139.02 | -863.12 | 0.00 | 53,592.65 | 0.00 | 51.05 |
| | 02/11/2013 | | Loan Disbursement | -54,404.72 | -53,592.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51.05 | 53,592.65 | 0.00 | 51.05 |
| | 02/11/2013 | | Escrow Account Adjustment | -830.93 | 0.00 | 0.00 | -830.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53,592.65 | -830.93 | 51.05 |
| | | 03/25/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 04/02/2013 | | Suspense Transfer | -51.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -51.05 | 53,592.65 | -830.93 | 0.00 |
| | 04/02/2013 | | Suspense Transfer | 51.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51.05 | 53,592.65 | -830.93 | 51.05 |
| | | 05/02/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 05/17/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 06/24/2013 | Forbearance Payment | 333.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 333.00 | 53,592.65 | -830.93 | 384.05 |
| | | 07/03/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 07/02/2013 | Transaction History Fee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 07/11/2013 | | Forbearance Payment | 350.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 350.00 | 53,592.65 | -830.93 | 734.05 |
| | 07/11/2013 | | Altplan Suspense Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53,592.65 | -830.93 | 734.05 |
| 08/01/2012 | 07/11/2013 | | Payment | 0.00 | 84.57 | 312.62 | 169.62 | 0.00 | 0.00 | 0.00 | -566.81 | 0.00 | 53,508.08 | -661.31 | 167.24 |
| | | 07/11/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 07/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 07/18/2013 | | Tax Disbursement-HARRISON CITY | -718.15 | 0.00 | 0.00 | -718.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53,508.08 | -1,379.46 | 167.24 |
| | | 08/12/2013 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/01/2013 | 09/04/2013 | | Late Charge Assessment | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | -15.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 09/04/2013 | | Prior Servicer Fees | 863.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 863.12 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Property Inspection Fee | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.50 | 0.00 | 0.00 | 53,508.08 | -934.80 | 0.00 |
| | 09/04/2013 | | Forbearance Payment | 277.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 277.42 | 53,508.08 | -1,379.46 | 444.66 |
| | 09/04/2013 | | Suspense Transfer | -167.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -167.24 | 53,508.08 | -1,379.46 | 277.42 |
| | 09/04/2013 | | Escrow Account Adjustment | 167.24 | 0.00 | 0.00 | 167.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53,508.08 | -1,212.22 | 277.42 |

Defendants acknowledge that this is a typographical error and that the applicable provision is 12

C.F.R. § 1026.36(c)(3). *See* ECF No. 31 at PageID.1092, n.24.

ECF No. 1-4 at PageID.76 (black marker in original) (yellow highlights added) (reflecting Plaintiff's six *positive* payments of $10.50 "applied to" the balance of her loan on September 4, 2013, corresponding to the six *negative* $10.50 charges "assessed" as early as March 2013); *see also* 31-16 at PageID.1929–30.

Second, Plaintiffs assert that Defendants applied a series of fraudulent charges to Sharon's escrow account. *See* ECF No. 1 at PageID.4–7. According to Plaintiffs, from January 7, 2020, to July 1, 2022, Defendants charged Sharon's escrow account without using the amounts levied for insurance or property taxes. *See id.*; *see also* ECF No. 1-4 at PageID.84–86. The challenged charges total approximately $11,900. *See* ECF No. 1-4 at PageID.84–86. Ultimately, Plaintiffs allege that these charges improperly inflated Sharon's escrow account deficit, increasing her loan reinstatement payoff amount. *See* ECF No. 1 at PageID.4–7.

About a month after filing their Complaint, Plaintiffs filed a motion for a temporary restraining order (TRO), seeking an order staying *Clare County I*. ECF No. 3. The next day, this Court denied Plaintiffs' request because federal courts cannot enjoin ongoing state-court cases except in three scenarios, none of which applied. ECF No. 4 (citing 28 U.S.C. § 2283); *see also Smith v. Bayer Corp.*, 564 U.S. 229, 306 (2011) (noting exceptions to the Anti-Injunction Act are "narrow" and should not "be enlarged by loose statutory construction.").

On January 26, 2024, Defendants filed a motion to dismiss under Civil Rule 12(b)(1), arguing that the *Colorado River* abstention doctrine[8] applied to this case because *Clare County I*

---

[8] The narrowly applicable *Colorado River* abstention doctrine directs federal courts to abstain from resolving a case when parallel proceedings are ongoing in another adequate jurisdictional forum, i.e., state court. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). It may also apply when a combination of factors, such as the potential of piecemeal litigation, would "counsel against concurrent federal proceedings." *Id.* at 819. This doctrine is distinct from the doctrine of *res judicata*, contrary to Sharon's Counsel's representation in a state-court hearing. *See* ECF No. 31-6 at PageID.1318–19.

was based on the same underlying facts. ECF No. 12 at PageID.872, 874. Rather than address whether *Colorado River* abstention applied, Plaintiffs responded by stating that they had "[s]ufficiently pled the complaint" because they "specifically identified [] damages arising from the RESPA and TILA violations." ECF No. 16 at PageID.970. Plaintiffs also opposed Defendants' motion because, according to them, Defendants failed to comply with Local Rule 7.1's meet-and-confer requirements. *See id.* at PageID.968–69. They then filed a motion requesting that this Court not resolve Defendants' motion to dismiss for seven days so they could collect and file additional evidence. ECF No. 19.

In the end, this Court denied Defendants' motion to dismiss and denied as moot Plaintiffs' motion for a delay. *See* ECF No. 21. At that juncture, the Parties had not provided enough information about *Clare County I* to assess the *Colorado River* abstention doctrine's applicability to *Federal II*. *See id.* at PageID.1022. *Federal II* sat relatively idle after that decision.

### E. 2024–2025: Second Wave of State-Court Litigation

After Plaintiffs filed *Federal II* and while it sat idle, the Parties pushed forward in state court. Plaintiffs filed a second case in state court, which was eventually dismissed for failing to state a viable claim. The Parties also returned to *Clare County I* and settled the case, despite some consternation. The state-court litigation is summarized in detail below.

#### 1. Plaintiffs File *Clare County II*

On February 21, 2024, Plaintiffs filed a second state case against Defendants in the Clare County Circuit Court, *Clare County II*. ECF No. 31-8 at PageID.1364. In that case, Plaintiffs asserted that Defendants and their attorneys tortiously interfered with a hazard insurance contract between Plaintiffs and Farm Bureau Insurance Company. *See id.* at PageID.1383–84, 1388–90. Specifically, Plaintiffs alleged that Defendants—as loss payees on Plaintiffs' insurance policy—refused to execute checks that Sharon needed to complete repairs of the property subject to the

2019 Sheriff's Sale. *Id.* at PageID.1386–90. Without elaborating, Plaintiffs also claimed that this alleged refusal placed Plaintiffs "in danger of losing their insurance coverage" on the property. *Id.* at PageID.1387.

### 2. March 2024 Settlement Hearing in *Clare County I*

After Plaintiffs launched *Clare County II*, the Parties continued to advance *Clare County I*. At a hearing on March 12, 2024, Sharon and Defendants reached a settlement and recited the material terms of the settlement on the record. *See* ECF No. 31-15. The agreed upon settlement included the following material terms: (1) Sharon's loan would bear a stipulated payoff "amount of $85,041.72 with per diem interest in the amount of $2.29 per day" and if Defendant advanced "any additional insurance" the "monthly amount would be $397.95"; (2) Sharon would pay "off the mortgage with a new loan"; (3) Defendants would pay Sharon $22,000 as consideration to encourage the settlement; (4) Defendants would not further encumber the property; (5) Defendants would "remove the credit line pertaining to this foreclosure"; (6) the order effectuating the settlement would rescind the 2019 Sheriff's Sale. *See id.* at PageID.1520–21.

Before completing the hearing, Sharon's Counsel—who also represents Plaintiffs in this case—requested "that [she] be allowed to confirm on the record that" Sharon agreed. *Id.* at PageID.1522. The court agreed, and Sharon engaged in the following dialogue with her attorney:

> **Sharon's Counsel**: Thank you. [Sharon], you heard all of the terms placed on the record today, are you in agreement with this settlement?
>
> **Sharon**: Yes.
>
> ***
>
> **Sharon's Counsel**: And do you understand that if we went to trial on this matter, we could prevail or [lose], and you could get a better settlement, or a worse settlement in this case?
>
> **Sharon**: Yes.

>**Sharon's Counsel**: And did I satisfactorily answer all of your questions?
>
>**Sharon**: Yes.

*Id.* After this exchange, the state court directed the Parties to submit a proposed order effectuating their settlement. *See id.* at PageID.1521–23.

### 3. September 2024 Settlement Hearing in *Clare County I*

After several months passed without the Parties submitting a draft order in *Clare County I* that finalized the settlement, the state court directed the Parties to attend a second settlement hearing on September 30, 2024. *See* ECF No. 31-6 at PageID.1303, 1305–06, 1313–14, 1351. At the start of the hearing, Sharon's Counsel reiterated that the Parties agreed on the loan payoff amount of $85,041.72 and did not wish to set aside the settlement. *See id.* at PageID.1313, 1316. But she indicated that Sharon disputed some of the terms in the memorialized settlement agreement that Defendants sent her. *See id.* at PageID.1316–54.

One term that Sharon disputed was a confidentiality provision. *See id.* at PageID.1316–21. Defendants included the provision to ensure that Sharon or her Counsel would not publish the settlement online to "encourage . . . frivolous lawsuits." *Id.* at PageID.1318. But Sharon's Counsel worried that a confidentiality term could limit Sharon's ability to testify in this case and before the Michigan Attorney General, if necessary. *Id.* at PageID.1318–21. The court agreed that the confidentiality term should specify that Sharon is not barred from disclosing settlement terms "in . . . pending litigation" or "any Attorney General cases." *See id.* at PageID.1330–32.

Sharon also disputed the contemplated release-of-claims provision. *Id.* at PageID.1321, 1326–27. This provision would have released all claims related to or arising out of *Clare County I*, including Plaintiffs' TILA and RESPA claims in *Federal II* and all unknown or future claims. *See id.* at PageID.1326–27, 1332–34. Even though Sharon's Counsel had already stipulated to a loan payoff amount—in essence, a stipulated loan accounting—she insisted, confusingly, that she

could not agree to release Sharon's RESPA and TILA claims, which, once again, are based on Defendants' purported accounting errors. *See id.*

Due to Sharon's Counsel's resistance to the release-of-claims provision, the state court eventually questioned whether the Parties reached a "meeting of the minds" in the first instance:

> **The State Court:** So, Ms. Moran[,] I guess what I am hearing from you is that there isn't, there was no meeting of the minds. So, that there is just no meeting of the minds, I mean we can't work out the side terms of this agreement[,] so therefore what you['re] telling is that we need to just schedule this for a trial and be done.

*Id.* at PageID.1334. Sharon's Counsel and the court then engaged in a colloquy, during which Sharon's Counsel explained that the Parties reached an agreement but that it must be limited to the terms placed on the record at the March 2024 hearing:

> **The State Court**: [W]e are fighting over issues that I think are a pretty big deal. Whether this resolves the other stuff or not, that appears to be what the idea of the defense was, is that those issues were resolved. . . . I am trying to resolve this case, . . . . What I am hearing is language that is telling me that I can, based on your response to her argument, say fine[,] we will go to trial and be done with it, and then I don't have to worry about this. You may speak, --
>
> ***
>
> **Sharon's Counsel**: Thank you. So, it appears[,] Your Honor[,] that you are attempting to have a chilling [e]ffect by stating incorrectly, I will politely say it, that there was no meeting of the minds. There was a meeting of the minds, it was clearly placed on the record, we have a transcript. [Defense Counsel] had a full opportunity to add to, subtract from, or correct said transcript, she did not. Now[,] after the fact[,] . . . [they're] attempting to add in all this extra language that was never discussed, never negotiated, and never put on the record. Stating that my client can't [pursue] her claims in Federal Court . . . . But it does matter when a party [comes] into this Court and tries to add in things to a settlement that were never agreed to and never placed on the record.

*Id.* at PageID.1334–36.

Because of this dispute, Defendants stated they would be willing to strike much of the release-of-claims provision. *See id.* at PageID.1332–33, 1336–39. In their view, the settlement and dismissal of *Clare County I* with prejudice would bar any related pending claims under the doctrine

- 17 -

of *res judicata*, including *Federal II*'s TILA and RESPA claims. *See id.* As a result, Defendants conceded so long as the Parties included two terms in the release-of-claims provision: (1) that by striking the language releasing the TILA and RESPA claims, Defendants were not conceding that those claims were still viable; and (2) that all unknown claims are released, so Sharon could not "come back in a year or two and come up with a new claim that relates to this settlement that should have been settled as part of this transaction." *Id.* at PageID.1340–41, 1344–45.

Defendants' suggestion led to a resolution of the issue. *See id.* at PageID.1343–46. The court and the Parties agreed to strike the clause that released the claims in *Federal II*, noting that Defendants did not concede that those claims were viable. *See id.* at PageID.1339–40. And they ultimately concluded that—despite Defendants' initial request for the term—striking the release of unknown claims clause was the simplest solution to ensure the Parties settled. *See id.* at PageID.1344–46.

That left one final disputed term: the amount Sharon owed in interest that had accrued since the March 2024 settlement hearing. *See id.* at PageID.1348–54. Again, Sharon's Counsel agreed that the loan payoff amount was $85,041.72. *Id.* at PageID.1348–49. Yet despite Sharon's agreement in March to pay per diem interest that continued to accrue—and Sharon's Counsel's insistence that the March settlement terms be enforced as stated—Sharon's Counsel argued that Sharon should not have to pay the accrued interest. *See id.* at PageID.1348–54. Sharon's Counsel blamed Defense Counsel for the seven-month delay in finalizing a settlement, which, she argued, caused the ongoing accrual of interest. *See id.* at PageID.1349. To that end, Sharon's Counsel asserted that Defense Counsel triggered the delay because she did not send Sharon's Counsel a draft settlement until eight days after the March 2024 settlement hearing, when the Parties agreed Defense Counsel would do so seven days after the hearing. *See id.* at PageID.1349–50, 1313.

Sharon's Counsel also stated that she sent proposed edits to the draft, which Defense Counsel allegedly never shared with Defendants. *See id.* at PageID.1349.

But the state court rejected Sharon's Counsel's contentions. *See id.* at PageID.1349–55. It observed that even if Defense Counsel were dilatory, Sharon's Counsel never "file[d] [a] motion or advance[d]" the settlement "in any way to prevent . . . interest from accruing." *Id.* at PageID.1349. So the court ruled that Sharon was responsible for the per diem interest that had accrued since the March 2024 hearing and directed Defense Counsel to submit a proposed order that finalized the settlement.[9] *Id.* at PageID.1354.

### 4. *Clare County II* Dismissed

Following the September 2024 hearing in *Clare County I*, on November 26, 2024, the state court dismissed *Clare County II*. *See* ECF No. 31-9. The court concluded—like it did in *Clare County I* and Judge Cox did in *Federal I*—that Janette was not a proper plaintiff because any injury from Defendants' alleged tortious interference injured Sharon, not Janette. *See id.* at PageID.1455–56. The court also concluded that Sharon failed to state a viable claim for tortious interference. *Id.* at PageID.1456–57. And the court explained that even if she did state a viable claim, it was barred by the doctrine of *res judicata* and Michigan Court Rules. *Id.* at PageID.1460–61. Indeed, because *Clare County II* involved the same parties and claims related to those in *Clare County I*, Michigan law required Sharon to supplement her complaint in *Clare County I* rather than bring a separate action. *See id.*

After concluding that Plaintiffs failed to state a viable claim, the court awarded Defendants costs and attorneys' fees, finding that Plaintiffs' claims were frivolous. *Id.* at PageID.1457–59.

---

[9] According to an affidavit that Janette recently filed, the total payoff amount now surpasses $93,000 when the accrued interest and other fees are applied. *See* ECF No. 41-1 at PageID.2366.

First, the court found that Janette's claims were frivolous because the court dismissed her claims

in *Clare County I* for the same reasons:

> The parties to this litigation are nearly identical to [the initial state case]. The facts of this case rely on the events of [*Clare County I*] as their foundation. The claims by Janette Curtis, as an individual, are likely barred by res judicata. The issue of Janette Curtis' individual claims was resolved by summary disposition. The parties in each case are substantially identical. Janette Curtis made individual claims regarding the foreclosure of a house she does not own, and now she was part of claims for tortious interference regarding the maintenance of a house she does not own. Then, and now, Janette Curtis never presented any legal argument that lends to a proper claim for her to make. In [*Clare County I*], she was dismissed for these reasons. It is an error for Plaintiffs and their counsel to come to court with nearly identical facts and no supportive basis in law in the complaint[,] and to present Janette Curtis as having claims in this case against these Defendants.

*Id.* at PageID.1457–58. Second, Sharon's tortious interference claims had "no basis in fact or law,"

further warranting sanctions for frivolity.[10] *See id.* at PageID.1458–59.

### 5. Orders Effectuating the *Clare County I* Settlement

Once the state court dismissed *Clare County II*, it entered a final order and judgment

effectuating the settlement in *Clare County I* on January 3, 2025. ECF No. 31-7. This order, among

other things, accomplished the following: it (1) rescinded the 2019 Sheriff's Sale; (2) reinstated

Defendants' mortgage on Sharon's property; (3) directed Sharon to repay her loan at the stipulated

payoff amount of $85,041.72 within forty-five days; (4) directed Defendants to pay Sharon the

agreed upon $22,000 in consideration for the settlement; and (5) dismissed the case with prejudice

and without costs to the Parties.[11] *Id.* at PageID.1361–62. Post-judgment motions followed. *See*

ECF Nos. 40-2; 40-3.

---

[10] It appears that on May 27, 2025, Plaintiffs sought leave to file an untimely appeal in *Curtis II*. *Curtis v. Ocwen Loan Servicing, Inc.*, Case No. 375875 (Mich. Ct. App. 2025), https://www.courts.michigan.gov/c/courts/coa/case/375875 [https://perma.cc/FX5K-XV72].

[11] Notably, the promissory note and mortgage terms would have allowed Deutsche Bank to pursue attorneys' fees and costs for the litigation. ECF No. 1-4 at PageID.48, 58. But they presumably waived this right.

Defendants, for their part, moved to amend the January 3, 2025 order to require Sharon to repay the loan *before* the court rescinded the Sheriff's Sale.  ECF No. 40-2. Essentially, Defendants sought to avoid Sharon taking the settlement consideration and refusing to repay her loan. *Id.* at PageID.2321 ("In the event that [Sharon] fails to pay off the loan after receipt of payment from Defendants, Defendants will be out of the consideration paid to resolve this dispute and then have to restart foreclosure proceedings—which[] will open up Defendants to further challenges to foreclosure by [Sharon].").

Sharon, for her part, moved for reconsideration of the order. ECF No. 40-3. Sharon argued that when the Parties calculated the loan payoff amount included in the order, they mistakenly relied on insurance escrow charges that she alleges are fraudulent in *Federal II*. *See id.* at PageID.2340–43. In Sharon's view, the loan payoff needed to be recalculated once again. *See id.* Sharon also rehashed her position that Defendants should pay any accrued interest because they delayed finalizing the settlement. *See id.*

On February 7, 2025, the state court (1) granted Defendants' motion to amend, (2) denied Sharon's motion for reconsideration, (3) vacated the January 3, 2025 order, and (4) issued a new final order that dismissed the case with prejudice. *See* ECF No. 36-2; *see also Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.). As Defendants requested, the February 7, 2025 order permits rescission of the 2019 Sheriff's Sale only if Sharon pays off her loan within 30 days of receiving payoff funds from the lender that Sharon's counsel had located. *See* ECF No. 36-2 at PageID.2052. But the February 7, 2025 order did not modify all other terms, including Sharon's base loan payoff amount. *See id.* at PageID.2051. Notably, Sharon did not file a timely appeal. *See Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.); *see also* MCR 7.104 (imposing 21-day deadline to appeal).

### F. Early 2025–Present: Return to *Federal II*

The Parties have returned *Federal II*. As Defendants signaled during the September 2024 settlement hearing, after the state court dismissed *Clare County I* with prejudice, Defendants moved for summary judgment in this case, *Federal II*. *See* ECF No. 31. Defendants argue that, among other things, preclusion doctrines bar Plaintiffs' TILA and RESPA claims. *See id.*

After Defendants filed their Motion, Plaintiffs filed two motions. First, Plaintiffs filed a motion seeking an order that stays their response to Defendants' Motion for Summary Judgment and compels Defendants to produce all insurance records regarding Sharon's loan accounts.[12] ECF No. 32. This Court stayed Plaintiffs' response pending resolution of the discovery issues raised in their Motion. Second, citing concerns that Defendants might attempt to evict Sharon, Plaintiffs filed a motion for a TRO enjoining Defendants from further transferring the property in dispute. ECF No. 39.

On May 5, 2025, this Court denied Plaintiffs' Motion to Compel and TRO. ECF No. 44. In the Opinion and Order, Plaintiffs were directed "to file a response to Defendant's Motion for Summary Judgment, ECF No. 31, on or before May 27, 2025." *Id.* at PageID.2424. But despite having three weeks to respond, on the day their response was due, Plaintiffs filed a last-minute Motion requesting a second, "brief adjournment" of their response due to their attorneys' "post covid complications." ECF No. 45 at PageID.2426. On May 28, 2025, this Court granted Plaintiffs' Motion and directed Plaintiffs to respond to Defendants' Motion for Summary Judgment by June 10, 2025. ECF No. 47 at PageID.2436.

---

[12] The Motion also sought an expedited conference, but the Parties were already required to attend a settlement conference eight days after Plaintiffs filed their Motion. *Compare* ECF No. 32 *with* ECF Nos. 30; 35.

Yet on June 10, 2025, Plaintiffs filed another last-minute Motion: A third Motion to Adjourn their Response to Defendants' Motion for Summary Judgment. ECF No. 46. They again cited their Counsel's medical complications. *See generally id.* But because Plaintiffs' Counsel had ample time to seek assistance to file a response after multiple adjournments, on July 7, 2025, Plaintiffs' third Motion to Adjourn was denied.[13] ECF No. 47. Even so, Plaintiffs filed an untimely Response to Defendants' Motion for Summary Judgment, which this Court has considered. ECF No. 49.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Courts cannot consider a nonmovant's inadmissible hearsay evidence. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). And the mere existence of a scintilla of evidence supporting the

---

[13] In the end, Plaintiffs had not demonstrated good cause for another extension under Civil Rule 6(b), *see Ott v. Fed. Home Loan Mortg. Corp.*, 535 F. App'x 488, 489 (6th Cir. 2013), having already had months to file a delayed Response and having known about their Counsel's medical complications for years. *See Kesterson v. Kent State Univ.*, 967 F.3d 519, 529 (6th Cir. 2020) ("While courts should be sensitive to medical issues affecting the parties in a case, that does not free attorneys from responsibility for staying up to speed on a case or mean that trial courts should ignore the costs to the system and the parties of" persistent delay.)

nonmovant's position will not suffice to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At this stage, courts cannot weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. Finally, courts must draw all reasonable inferences for the nonmovant. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024).

### III.

Up front, Defendants argue that both *res judicata* and collateral estoppel preclude Plaintiff's claims. *See* ECF No. 31 at PageID.1082–86. Under "the Full Faith and Credit Statute," state-court decisions may preclude relitigation of the issues underlying those decisions in federal lawsuits. *In re Calvert*, 105 F.3d 315, 317 (6th Cir. 1997) (citing 28 U.S.C. § 1738). This statute provides that "state judicial proceedings 'shall have the same full faith and credit in every court within the United States . . . as they have . . . in the courts of such State . . . from which they are taken.'" *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (quoting 28 U.S.C. § 1738). So here, this Court must apply Michigan law to determine whether Plaintiffs' TILA and RESPA claims are precluded. *See Elder v. Twp. of Harrison*, 489 F. App'x 934, 936 (6th Cir. 2012). As explained below, Defendants are correct: Michigan's *res judicata* and collateral estoppel principles bar Plaintiffs' claims here.

### A. Res Judicata

Start with *res judicata*. Michigan courts apply *res judicata* where (1) the prior action was decided on the merits, (2) the actions involve the same parties or their privies, and (3) the matter in the second suit was, or could have been, resolved in the first. *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004) (citing *Sewell v. Clean Cut Mgmt., Inc.*, 621 N.W.2d 222, 225 (Mich. 2001)). Michigan courts apply this doctrine broadly. *AuSable River Trading Post, LLC v. Dovetail Sols., Inc.*, 874 F.3d 271, 274 (6th Cir. 2017). To that end, in Michigan, *res judicata* bars not only claims

already litigated, but also those arising from the same transaction that a party, with reasonable diligence, could have raised. *Adair*, 680 N.W.2d at 396 (citing *Dart v. Dart*, 597 N.W.2d 82 (Mich. 1999)). And importantly, "Michigan preclusion law is broad enough to include" a plaintiff's "federal claims" that could have been brought in a state case that were not. *Buck v. Thomas M. Cooley L. Sch.*, 597 F.3d 812, 819 (6th Cir. 2010). Here, under these elements, the unappealed judgment in *Clare County I* bars Plaintiffs' TILA and RESPA claims.

First, *Clare County I* was decided on the merits. Indeed, the state court dismissed the case with prejudice. *See* ECF No. 36-2. And because the dismissal was with prejudice, it does not matter that the final order in *Clare County I* was effectuating a settlement rather than disposing of the case in another way. *See Limbach v. Oakland Cnty. Bd. of Cnty. Rd. Comm'rs*, 573 N.W.2d 336, 340 (Mich. Ct. App. 1997) (observing that even "a voluntary dismissal *with prejudice* acts as an adjudication on the merits for *res judicata* purposes") (emphasis added)); *see also Laethem Equip. Co. v. J & D Implement, Inc.*, No. 266648, 2007 WL 2067935, at *5 (Mich. Ct. App. July 19, 2007) (noting that under Michigan law "res judicata applies to settlements and consent judgments") (citing *Ditmore v. Michalik*, 625 N.W.2d 462, 466 (Mich. Ct. App. 2001)). So Defendants have established that *res judicata*'s first element applies.

Second, the actions involve the same parties or their privies. In Michigan, "a perfect identity of the parties is not required, only a substantial identity of interests that are adequately presented and protected by the first litigant." *Adair*, 680 N.W.2d at 397 (citation modified). Even so, *Claire County I* was brought by Plaintiffs against Defendants, the same Parties or privies here. *Compare* ECF No. 31-2 at PageID.1104 *with* ECF No. 1. Thus, the Defendants have demonstrated the second element.

Third, Plaintiffs had the opportunity to litigate their TILA and RESPA claims in *Clare County I*, which arose from the same underlying issues: Sharon's loan payoff account. The property inspection transactions that they now challenge took place in 2013. ECF No. 1-4 at PageID.76; *see also* ECF No. 31-16 at PageID.1929–30. Likewise, the escrow charges they allege were fraudulent began in January 2020, a month before they filed *Clare County I* in February 2020. *Compare* ECF No. 1-4 at PageID.84–86 *with* ECF No. 31-2. Thus, at the outset of that case— when they raised other claims concerning Sharon's loan account and payoff—Plaintiffs could also have pursued the TILA and RESPA claims they assert here. And, not to mention, when Plaintiffs amended their *Clare County I* complaint in August 2021, more than a year after the escrow charges began and nearly a decade after the property inspection transactions, Plaintiffs could have included those claims upon reasonable investigation. *See* ECF No. 31-4. They did not. *See generally id.*

And even assuming the transactions underlying Plaintiffs' TILA and RESPA claims did not predate their complaint or amended complaint in *Clare County I*, those claims still belonged in that case. Where, as here, "factual allegations that developed during the pendency of the initial suit" form part of the same transaction or relate to claims already asserted, Michigan law requires a party to amend or supplement their complaint to add the new claims rather than filing a subsequent case. *See Elder*, 489 F. App'x at 936; *Buck,* 597 F.3d at 817–18; *Dubuc v. Green Oak Township,* 312 F.3d 736, 750 (6th Cir. 2002). Failure to do so carries consequences: if the court resolves the original claims on the merits, *res judicata* bars later attempts to litigate the omitted ones. *Buck,* 597 F.3d at 817–18 (observing that a "plaintiff has a duty to supplement" or amend "her complaint with related factual allegations" and claims "that develop during the pendency of her state suit or have them barred by res judicata"); *Dubuc*, 312 F.3d at 750 (holding that when the facts for the new, related claims or that augment existing claims "occur[] before adjudication on

- 26 -

the merits of the initial suit" the plaintiff "is obliged to amend his or her initial complaint to add these new allegations").

At bottom, Defendants have established all three elements of *res judicata*. As a result, *Clare County I* precludes Plaintiffs' RESPA and TILA claims that they assert here.

### B. Collateral Estoppel

Turn to collateral estoppel, which also bars Plaintiffs' TILA and RESPA claims. Under Michigan law, collateral estoppel applies when four elements are satisfied: (1) the parties are identical in both proceedings; (2) the first proceeding ended in a valid, final judgment; (3) the identical issue was actually litigated and necessarily decided; and (4) the opposing party had a full and fair opportunity to litigate it. *People v. Gates*, 452 N.W.2d 627, 630–31 (Mich. 1990). Further, in Michigan, when, as here, collateral estoppel "is asserted defensively," the parties need not be identical. *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 850 (Mich. 2004). Thus, the first element is removed from consideration. *See id.*

Here, the order of dismissal in *Clare County I* forecloses Plaintiffs from relitigating whether Defendants applied fraudulent charges to Sharon's loan account. First, that dismissal, entered on February 7, 2025, is final because Plaintiffs did not timely appeal it. *See* ECF No. 36-2; *see also Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.). Second, in issuing the dismissal, the court necessarily rejected Plaintiffs' contention that Defendants inflated the loan payoff by applying fraudulent charges. Plaintiffs pressed that very point in a motion for reconsideration, asserting that the stipulated payoff reflected the alleged fraudulent charges that they challenge in this case. *See* ECF No. 40-3 at PageID.2340–43. The *Clare County I* court denied that motion for reconsideration, necessarily resolving the issue of whether the charges were fraudulent on the merits. *See* ECF No. 36-2; *see also Curtis v. New Rez, LLC, et al.*, Case No. 2020-0000900095-CH, (55th Cir. Ct. Clare Cnty., Mich.). And third, because

Plaintiffs had a full and fair opportunity to litigate that issue—having briefed it and obtained a hearing after they litigated the loan payoff total for years—collateral estoppel applies.

Because collateral estoppel applies and precludes relitigating whether Defendants applied fraudulent charges to Sharon's loan account to inflate her payoff total, Plaintiffs' TILA and RESPA claims lack merit. Indeed, the entire factual predicate for Plaintiffs' TILA and RESPA claims is that Defendants applied those fraudulent charges to Sharon's loan account. *See generally* ECF No. 1. And because *Clare County I* resolved that issue in favor of Defendants as explained above, it renders the TILA and RESPA claims here meritless.

In sum, Plaintiffs' TILA and RESPA claims are precluded. First, they are barred by res judicata. Second, even if res judicata did not bar them, collateral estoppel precludes relitigating their factual basis, rendering them meritless. So Defendants' Motion for Summary Judgment, ECF No. 31, will be granted, and Plaintiffs' Complaint, ECF No. 1, will be dismissed with prejudice.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 31, is **GRANTED**.

Further, it is **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE**.

**This is a final order and closes this case.**

Dated: September 29, 2025                          s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge